Carole M. HARTLEY, Plaintiff–Appellant,

v.

WISCONSIN BELL, INCORPORATED, Defendant–Appellee.

No. 96–2607.

United States Court of Appeals, Seventh Circuit.

Argued May 21, 1997.

Decided Sept. 5, 1997.

E. Campion Kersten (argued), Kersten & McKinnon, Milwaukee, WI, for Plaintiff–Appellant.

Deborah Gage Haude, William G. Miossi, Winston & Strawn, Chicago, IL, Bernard J. Bobber, Foley & Lardner, Milwaukee, WI, Stephen J. Liccione (argued), Wisconsin Bell Inc., Milwaukee, WI, for Defendant–Appellee.

Before POSNER, Chief Judge, and BAUER and MANION, Circuit Judges.

MANION, Circuit Judge.

Carole Hartley was 51 years old when she lost her job as a middle manager at Wisconsin Bell after the phone company underwent a major organizational restructuring. She sued under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., claiming that Bell fired her and retained two other managers, who were no more than seven years younger than she, on account of her age. The district court granted summary judgment to Bell after determining that Hartley did not successfully challenge Bell's facially nondiscriminatory reasons for firing her. We affirm.

## I.

Carole Hartley worked at Wisconsin Bell, a wholly-owned subsidiary of Ameritech Corporation, for about 23 years before the phone company determined it needed to restructure. Wisconsin Bell had been a subsidiary of Ameritech since the AT & T divestiture in 1984, but in 1993 Ameritech decided to consolidate its phone companies operating in different states into a single company under the Ameritech name. It called the reorganization "Breakthrough," which entailed combining all of its telecommunications business into 12 new business units that operated on an interstate basis. As Wisconsin Bell explains it, Breakthrough "described the process of transforming the company and its culture from a staid, technologically stable, monopoly-based environment to a highly competitive, technologically changing, customer-oriented, market-driven environment." With the new business units came new titles and new responsibilities for managers, who basically had to apply to be rehired by the company.

Before Breakthrough, Hartley was a manager of Remittance Operations in the Billing Services Department at Bell. She supervised about 15 employees who were responsible for collecting phone bills. There were two other people who also had managerial responsibilities in the same department: Linda Matthews and Judy Murray. Though Hartley argues that Murray was not a real "line" manager, and instead held a "staff" job providing support services, she did not contest the company's proposed finding in the district court that Murray and Matthews were managers just like her. In any event, the important point is that Murray, Matthews, and Hartley held similar positions and the company determined that only two such managers would be needed in its post-Break-

through existence. All three were competing for jobs as managers in Network Services essentially doing the same work they had done for Bell, though with significantly less staff support. Brenda Theus, the decision-maker and the supervisor of all three managers, chose Murray and Matthews. Hartley claims the decision was made on the basis of her age. At the time of her termination, she was 51, six years older than Murray (45) and seven years older than Matthews (44).

There are two ways a plaintiff like Hartley claiming employment discrimination can overcome an employer's motion for summary judgment. The first is by putting in enough evidence (whether direct or circumstantial) to raise a genuine issue concerning the employer's motivation in carrying out the challenged employment action. See, e.g., *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994). The second is the so-called *McDonnell Douglas* method, the frequently used burden-shifting framework first set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973).

The district court approached this case by using the McDonnell Douglas method, and the parties appear to agree that this is the approach we should use. Using the burden-shifting approach in a typical ADEA case makes sense, though the Supreme Court never actually has held that the *McDonnell Douglas* scheme applies in the ADEA context. See *O'Connor v. Consolidated Coin Caterers Corp.*, —— U.S. ——, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996). Defining the prima facie case is more difficult in the unusual circumstances at play here, where an employer partially reduces its workforce but does so after letting the employees compete (actually, re-apply) for positions within the restructured company. This is not a pure reduction in force case, at least not like the type encountered in *Testerman v. EDS Technical Products Corp.*, 98 F.3d 297, 299 (1996), where the employer pretty much determined that five employees were to be fired to save costs and the only remaining question was who. Nor is it like *Weisbrot v. Medical College of Wisconsin*, 79 F.3d 677, 679 (7th Cir.1996), where the college lost its funding

for a medical research program and was forced to fire the program's research technician. Those cases involved reductions in workforces on a small scale and resulted from no fundamental change in the way the employer did business.

In this case, Bell's workforce reduction resulted from a massive restructuring; in essence, no one's job was safe and nearly every manager had to reapply for positions within the new company. Not every manager was placed. By August 1993, just six months after announcing Breakthrough, Ameritech notified its employees that it was eliminating 1,200 to 1,500 management positions in the five state area (including Wisconsin) it serviced. The managers were told that some of them would be asked to leave the same day they were notified they had not been selected as managers in the new business units. And even some managers placed within the new units later were fired. Ironically, that happened to Brenda Theus, the supervisor who chose Murray and Matthews over Hartley. It also happened to Murray.

The *McDonnell Douglas* approach is not an efficient formula for such a large-scale workplace restructuring case. As we noted in *Sheehan v. Daily Racing Form Inc.*, 104 F.3d 940, 943 (7th Cir.1997), "[t]he assumption behind the approach in a case of termination is that the plaintiff was doing fine in his job, lost it, and was replaced by someone younger, or white, or male, or not handicapped, etc." Applying that approach here is somewhat problematic; it ignores the circumstances surrounding Hartley's termination and it presumes that she was singled out for termination. In fact, everyone's job—not just Hartley's—was in jeopardy, and no one has suggested that the reason for the restructuring itself was discriminatory. See *id.* ("there is no suggestion that the defendant decided to computerize its operations in order to get rid of its older workers, or for any other reason unrelated to bona fide business considerations"). Nevertheless, because parties and courts are comfortable approaching discrimination cases from the *McDonnell Douglas* framework, "[p]erhaps the way to preserve it here is to recast this case as a hiring case." *Id.* Hartley claims

that she should have been re-hired as one of the managers in Network Services, or at least as one of the 45 managers in Consumer Services. Bell responds by saying that she applied for these jobs too late, and that she was not as qualified for them as the candidates selected. Framed in this more familiar way, we can more easily apply the traditional *McDonnell Douglas* approach to Hartley's age discrimination claim to determine if the district court properly put an end to it when it did.

■ Under the *McDonnell Douglas* framework, Hartley's initial burden was to show (1) she was in the protected age group of 40 or older; (2) she was performing her job satisfactorily or was qualified for the job for which she applied; (3) she was discharged, not hired, not promoted, etc.; and (4) younger employees were treated more favorably. *Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir.1995). The district court paused only with respect to the fourth element, which we discuss below. But for now we assume (as Bell appears to do on appeal) that Hartley has met her prima facie case by showing that she was 51 years old at the time of her termination, she was performing her job satisfactorily and was qualified at least to be considered for a managerial position in Network Services, by not being hired for the position she effectively was terminated, and younger employees (Murray and Matthews) received managerial positions in the restructured company while Hartley did not.

## II.

■ Under *McDonnell Douglas*, the burden of production now shifts to Bell to set forth nondiscriminatory reasons for Hartley's termination. Bell tells us there are four of them: (1) Hartley's position was eliminated by Breakthrough; (2) she delayed in submitting her "preference slips" used in selecting employees in the new business units; (3) there were over 45 incumbents in the Consumer Services area competing for 45 open managerial positions, incumbents received priority for these positions, and she was not an incumbent; and (4) she lacked the "broader experience" possessed by Murray and Matthews. Once Bell met its burden of pro-

duction, Hartley could defeat the company's motion for summary judgment by demonstrating that its reasons are not true, or pretextual. Plaintiffs lose if the company honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless. *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992).

Hartley was not successful in calling any of these four reasons into question in the district court, largely because she never contested several of Bell's key proposed findings of fact. That failure presents her with the same hurdle here. For example, in response to Bell's first reason, Hartley contends that the company did not eliminate one of the three managerial positions (held by her, Murray and Matthews). Rather, according to Hartley, there were only two "real" managers in Remittance Operations and Murray wasn't one of them. Therefore, Bell simply substituted Murray for Hartley in the new company. The problem with that theory is that Hartley never contested the company's proposed finding of fact (para.5) that there were three remittance managers, each of whom was supervised by the same individual (Brenda Theus) and held the same salary grade. That was Hartley's chance to contest Murray's position as a manager. See Local Rule 6.05(d) ("[i]n deciding a motion for summary judgment, the court will conclude that there is no genuine issue as to any proposed finding of fact to which no response is set out"); see also Fed.R.Civ.P. 56(e); *Adler v. Glickman*, 87 F.3d 956, 959 (7th Cir.1996) ("Because [plaintiff] failed to comply with Rule 56 and Local Rule 6, § 6.05, the district court properly ... deemed him to have admitted the facts as presented by the defendant."). So for purposes of this case there were three remittance managers, and as no one disputes that the company decided to re-hire only two of them, it makes sense for Bell to contend that one of the managerial positions was eliminated. Rather than rebutting this reason, Hartley's decision not to contest the company's proposed finding of fact amounted to conceding it.

The second reason Bell decided not to re-hire Hartley relates to Bell's method in

searching for candidates to fill the managerial positions. Bell divided its managerial positions into four tiers-A, B, C, D—and as early as March 1993 directed its employees (by letter) to fill out preference slips indicating what positions the manager sought in the new company. Bell contends that it instructed its managers to return the preference slips promptly in order to be considered for a managerial position, and that Hartley submitted her preference slips too late (at the end of July, almost 3 months late) to be considered. In her deposition, Hartley agreed that she did not "think" she returned these slips until late July, but according to her subsequent affidavit, she realized after searching her memory that she had directed her preference slips to Scott Theis, Bell's transition coordinator, just weeks after receiving the forms in March. Bell contends that her affidavit testimony materially contradicts her deposition, which of course she cannot do without good reason under *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67–68 (7th Cir.1995).

Remembering dates is not always easy, even when preciseness is crucial to a litigation, so we are reluctant to conclude that the Russell rule applies here. It matters not. At most Hartley has proven that Bell was mistaken about when it received her preference slips just as she initially was mistaken about when she sent them in. (Hartley herself maintains that Bell was inundated with so many preference slips from managers that it could not keep up with the volume and lost some of the data.) The point is that Hartley has not directed us to any evidence suggesting that Bell did not honestly believe Hartley's preference slips were late, or, in other words, suggesting that Bell was lying. *McCoy*, 957 F.2d at 373 ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers.").

Bell's third reason for terminating (or not rehiring) Hartley related to her application for a managerial position in the new company's Consumer Services unit. According to Bell, it favored incumbents for such jobs because they had more "position-specific skills" and Hartley was not an incumbent. Moreover, Bell had only 45 positions available in Consumer Services and over 45 incumbent managers competing for them, so the odds were stacked against picking Hartley. Hartley contends that while incumbency may have been a factor in selecting potential candidates for these positions, it was not used to decide which candidates got the jobs. Perhaps, but Bell's point clearly is that incumbency and "position-specific skills" went together, which is why picking candidates on the basis of "position-specific skills" ended up favoring incumbents. So it is significant that Hartley was not an incumbent (something she obviously does not contest), and that from the company's perspective, that status translated into being less qualified to do the job. Hartley had the burden to direct us to evidence suggesting that Bell did not equate incumbency with skill, or did not use that equation to pick managers in Consumer Services, which might lead to an inference that age was the real reason for the company's decision not to pick her. She did not do this, nor does our own review of the record suggest it.

That leaves us with Bell's fourth reason: Hartley was less qualified than Murray and Matthews to be Network Services managers. Of all the jobs Hartley applied for in the "new" Ameritech, this obviously was her best shot. She was an incumbent in this job, meaning that from Bell's perspective she had the necessary skills and experience. Bell does not contest her general qualifications. But in the end the company decided to retain only two managers (after all, the point of Breakthrough was to become more efficient), which meant that Hartley, Murray, or Matthews had to go. Brenda Theus interviewed all three. According to her affidavit, she preferred Murray and Matthews because they had worked in staff roles supporting Remittance Operations, and the new Network Services unit would not have staff support. Hartley claims that she was more qualified than Murray because Murray's experience was limited to staff support. But apparently Bell thought such experience made Murray more attractive, not less so, and Bell is entitled to its preferences. Bren-

da Theus also testified (by affidavit) that just weeks before she made her decision Hartley claimed to become nauseated when she thought of the prospect of communicating with Theus. Hartley disputes having made the comment, but the record reveals that Theus documented it in an interoffice memorandum the very next day. At the very least, there is nothing in the record suggesting that Theus did not believe Hartley made the comment, nor for that matter anything to suggest that Hartley's age, rather than her perceived attitude or lack of staff experience, influenced Theus' decision.

### III.

■ Finding no evidence of age discrimination based on this record should not be surprising. Hartley was 51, only six years older than Murray and seven years older than Matthews. Even before the Supreme Court decided *O'Connor*, we noted that the prima facie case under the ADEA required a sufficient disparity in ages between the plaintiff and those allegedly favored over her. See *Roper v. Peabody Coal Co.*, 47 F.3d 925, 927 (7th Cir.1995) (noting that the "disparity in age ... must be sufficient to create a reasonable inference of age discrimination"). Thus even before *O'Connor* the rule in this circuit was that a plaintiff could not necessarily carry her initial burden under the *McDonnell Douglas* burden-shifting scheme by offering evidence only that her employer favored a younger employee. But we went no further, at least deciding not "to attempt definition of a sufficient disparity." *Id.*

But the Supreme Court has since advanced the ball. In *O'Connor*, the Court rejected the Fourth Circuit's holding that an ADEA plaintiff has not set out a prima facie case without proof that he was replaced by someone outside the protected class, i.e., younger than 40. The Court held that there was no basis for that requirement under the statute, which banned discrimination against employees because of their age, period. (The issue is age discrimination, as opposed to "40 or over" discrimination; the age of 40 is significant only because it limits the scope of the protected class under the statute.) ——— U.S. at ———, 116 S.Ct. at 1310. If that was the

extent of the *O'Connor* decision, then we would be left on our own to decide whether the ADEA prohibits discrimination regardless of the ages of those the employer allegedly favored, i.e., without regard to the age disparity issue. But *O'Connor* says more. Indeed, it instructs that an ADEA plaintiff has not established a prima facie case without producing "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion. . . ." *Id.* (quoting *Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977)). And "[i]n the age discrimination context, such an inference can not be drawn from the replacement of one worker with another worker insignificantly younger." *Id.* (emphasis added). The "fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." *Id.* (emphasis added).

In some cases, the disparity in ages between the plaintiff and the replacement will be sufficient on its face to meet the Supreme Court's test. *O'Connor* was 56 at the time he was fired; his replacement was 40. The Supreme Court did not actually decide whether that disparity met its own test, but we suspect it did. We are far less certain here. Hartley was only 51, and Murray and Matthews were well into their 40's. Brenda Theus herself testified that all three looked like they were in their mid to late 40's. Murray and Matthews were younger than Hartley, but not "substantially" or "significantly" so.

■ And yet that conclusion begs the obvious question: how much older than a replacement does a plaintiff have to be in order to pass *O'Connor's* test? The Supreme Court did not elaborate, though it did seemingly reject a three-year age difference (a 68–year old replaced by a 65–year old). *Id.* Prior to *O'Connor* the Third Circuit determined that an eight-year age gap (52 vs. 44 years of age) satisfied a "sufficiently younger" test, *Barber v. CSX Distribution Services*, 68 F.3d 694, 699 (3d Cir.1995), while the Court of Appeals for the District of Co-

lumbia determined that plaintiffs had not established a prima facie case of discrimination despite producing evidence of an eight-year difference between the average ages of two groups (54 vs. 46 years of age). *Adkins v. Safeway, Inc.*, 985 F.2d 1101, 1104 (D.C.Cir.1993). Since *O'Connor*, the Eighth Circuit has held that a five-year disparity in ages is not substantial enough to support an inference of age discrimination (although of six hired in that case two hirees were the same age or slightly older than the plaintiff). *Schiltz v. Burlington Northern Railroad*, 115 F.3d 1407, 1413 (8th Cir.1997). While we suspect that the answer depends to some extent on the circumstances in a case, we consider a ten-year difference in ages (between the plaintiff and her replacement) to be presumptively "substantial" under *O'Connor*. In cases where the disparity is less, the plaintiff still may present a triable claim if she directs the court to evidence that her employer considered her age to be significant. In that instance, the issue of age disparity would be less relevant. Indeed, it may not be relevant at all because the employee's case likely would be one of direct evidence, not the burden-shifting indirect evidence framework set out in *McDonnell Douglas* and applied in *O'Connor*.

In indirect cases like this one, the employee basically is relying on inferences, which *O'Connor* recognizes result in some cases being built on "very thin evidence." —— U.S. at ——, 116 S.Ct. at 1310. The Supreme Court's "proper solution to the problem" of thin-evidence cases was to determine that no inference of discrimination could be drawn from the replacement of one worker with another worker insignificantly younger. Ten years is a reasonable threshold establishing a "significant" and "substantial" gap, which is what *O'Connor* demands. Yet the line we draw is not so bright as to exclude cases where the gap is smaller but evidence nevertheless reveals the employer's decision to be motivated by the plaintiff's age. Hartley, 51 years old, was only six years older than Murray and seven years older than Matthews. It is a presumptively insubstantial gap and the record reveals no evidence that Bell viewed the age of 51 itself to be significant. Of course, even if the gap were sub-stantial, it would mean only that Hartley had set out a prima facie case of discrimination. Ultimately, a plaintiff in an ADEA case must prove that she suffered an adverse job action because of her age. And when the case is an indirect one, the employer wins if its reasons were not successfully called into question, which is precisely what happened here.

We therefore affirm the district court.