**Kathleen A. KARIOTIS, individually and as best friend of Peter Kariotis, a minor, and Angelo Kariotis, Plaintiffs–Appellants,**

v.

**NAVISTAR INTERNATIONAL TRANSPORTATION CORPORATION, Defendant–Appellee.**

**No. 97–1470.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 3, 1997.

Decided Dec. 9, 1997.

Micaela M. Daly, Marc D. Fisher (argued), Bell, Boyd & Lloyd, Chicago, IL, for Plaintiffs–Appellants.

David J. Parsons (argued), Allison Despard, Littler & Mendelson, Chicago, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, and MANION and KANNE, Circuit Judges.

MANION, Circuit Judge.

 Kathleen Kariotis was discharged from her position as an executive assistant at Navistar after the company decided she had fraudulently accepted disability benefits following her knee replacement surgery. Kariotis filed suit in federal court claiming violations of the ADA, ADEA, ERISA, COBRA, FMLA, and the Illinois Health Insurance Claim Filing Act. After some discovery, Navistar filed a motion for summary judgment, invoking the so-called "honest belief" rule, which in this context means that while the company may have been mistaken in concluding Kariotis actually had committed fraud, at the very least it had an honest belief that she had done so. The district court agreed and granted summary judgment, prompting Kariotis to appeal. Navistar's "honest belief" defeats all of Kariotis' claims except her COBRA claim. Accordingly, we affirm in part and reverse and remand in part.

## I.

Kathleen Kariotis began her disability leave on account of knee replacement surgery in March 1995, and for the following ten weeks she received full pay. Ten weeks is about how long her doctor initially expected she would need to recover. But her return-to-work date was extended several times, and her doctor soon determined that she required two post-operative procedures known as knee "manipulations." The first manipulation occurred on May 12, 1995; the second on June 28. By the time Kariotis had her second manipulation, her 10 weeks of fully-paid leave had expired; she then received 60% of her base pay. Under Navistar's disability plan, she could expect to receive that percentage until her physician released her to return to work.

Kariotis' extended leave did not go unnoticed. By mid-June it came to the attention of William Vlcek, the company's manager of human resources. He discussed the extensions with his boss, Robert Goldie. According to Navistar, Vlcek and Goldie were concerned because Kariotis' claimed disability was inconsistent with observations made by some Navistar employees. And two years earlier Kariotis had been accused of unethical conduct. Kariotis claims that Vlcek actually was suspicious of her leave before he learned of her extensions, and that his suspicion was based on the length of time his mother needed to recover from knee replacement surgery. This dispute over what prompted Vlcek's suspicion is hardly material (neither version, if true, would suggest a discriminatory motive). For our purposes, it is important only that Vlcek and Goldie were sufficiently suspicious of the validity of Kariotis' leave to investigate it.

Objectively speaking, their investigation left something to be desired. Rather than approaching Kariotis or her doctor, they hired a company to videotape her movements while off-duty. The private investigators videotaped Kariotis on three separate occasions: June 17, June 20, and June 26, 1995. Each time they reported seeing Kariotis walking, driving, sitting, bending, and shopping (pushing a grocery cart). They were not medical experts, but they nevertheless reported that while Kariotis' stride did not exactly appear even, neither did she appear disabled or physically impaired. Even then Navistar could have followed up by speaking with Kariotis' physician—the one who scheduled the two post-operative manipulations— but it didn't. Nor did the company insist on a second opinion by having its own doctor examine Kariotis.

Kariotis next met with Vlcek at Navistar's offices on June 30. The meeting appears to have been cordial, probably because Vlcek did not tell Kariotis about the videotape. Both parties agree that during the meeting Kariotis stated she now could do physical things she could not do "before." But before what? Based on what he saw on the videotape—Kariotis shopping and walking around long before her second knee manipulation— Vlcek interpreted Kariotis' "before" statement to be a lie. But Kariotis now says that she was not comparing her activity to what she could do days before her second knee manipulation (on June 28); she was comparing her activity to what she could do before her initial knee surgery in March. In the district court, Kariotis complained that Vlcek made no attempt to clarify what she meant.

After his conversation with Kariotis, Vlcek convened a meeting with Goldie and other Navistar managers to discuss Kariotis' future. The group watched the videotape of Kariotis' off-duty activities since her surgery. Kay Carroll, one of the managers in attendance, was asked to be an objective third party. Carroll suggested that Vlcek confront Kariotis' physician with the videotape and ask him if Kariotis could do her job, but Vlcek declined, finding the videotape capable of speaking for itself. On July 6, Vlcek met Kariotis at the office of the company's physi-

cian and personally handed a termination letter to her. The letter stated that Kariotis was being discharged for cause because she dishonestly had claimed disability benefits since June 17. In addition, she had been absent from work for more than five days without good reason. The letter gave Kariotis until July 20 to seek reinstatement in writing, and within that time period she did just that. She wrote Goldie and contended that she should not have been terminated while on disability leave. Her doctor also wrote Goldie a letter in which he labeled the charge of disability fraud "preposterous" given Kariotis' physical condition. But the letters did not win Kariotis' reinstatement; instead, Goldie wrote Kariotis and effectively told her that her case was closed. At the time, Kariotis was about 57 years old; eventually, Navistar replaced her with a 32-year-old woman.

Goldie's letter did not close the case as far as Kariotis was concerned. She filed a complaint alleging numerous statutory violations (the ADA, ADEA, ERISA, COBRA, FMLA, the Illinois Health Insurance Claim Filing Act) and one pendent state common law claim for negligent infliction of emotional distress. The district court entertained cross-motions for summary judgment and granted Navistar's in full with one exception: it left alone the negligent infliction claim, but declined to exercise supplemental jurisdiction over it once it had dismissed all the statutory claims. Now Kariotis appeals that decision.

**II.**

In an apparent effort to leave no stone unturned, Kathleen Kariotis is suing Navistar under five federal statutes (the ADA, ADEA, ERISA, COBRA, FMLA) and one state statute (the Illinois Health Insurance Claim Filing Act). In other words, Kariotis believes that she was fired because she was disabled, because of her age, because she opted to receive benefits under Navistar's welfare benefit plan, and because she required leave to recuperate from her surgery. The multiplicity of claims makes Kariotis' case cumbersome, but it is not legally impossible for a plaintiff to be aggrieved under all of these statutes at the same time. Still, in

order to avoid immediate suspicion that she is just throwing darts in the hope that one claim sticks, Kariotis has spliced together a theory of the case that touches each statute. As she argues in her main appellate brief, Navistar's motivation for firing her "was based on a combination of unlawful purposes. Navistar wanted to get rid of [her] because she was an aging woman whom Navistar perceived to be disabled and who had increasingly severe physical problems that were costing Navistar money."

■ At its core Kariotis' claim is, as it must be, one of discrimination, which is why the parties group her claims under the ADA, ADEA, and ERISA. In order to survive a motion for summary judgment, a plaintiff in a discrimination case need not "produce the equivalent of an admission of guilt by the defendant." *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 737 (7th Cir.1994). Rather, the plaintiff need only raise an inference of discrimination, which can be done in two ways. The first is by putting in enough evidence (whether direct or circumstantial) to raise a genuine issue whether the employer has a discriminatory motivation in carrying out the challenged employment action. *Id.* at 736. The second is the so-called *McDonnell Douglas* method, the frequently used burden-shifting framework first set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973).

The district court approached this case under the *McDonnell Douglas* framework, and the parties appear to agree that this is the approach we should use. Of course, *McDonnell Douglas* involved a claim of discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,*

but we have applied the burden-shifting framework to claims brought under other employment discrimination statutes. *See Weigel v. Target Stores,* 122 F.3d 461, 465 (7th Cir.1997) (applying the framework to a claim under the ADA); *Hartley v. Wisconsin Bell Inc.,* 124 F.3d 887, 890 (7th Cir.1997) (ADEA), and *Salus v. GTE Directories Service Corp.,* 104 F.3d 131, 135 (7th Cir.1997) (ERISA).

The *McDonnell Douglas* framework is by now routine. If a plaintiff can present a prima facie case of discrimination, then the defendant has the burden of explaining why it fired her, and if its reasons are nondiscriminatory on their face, the burden of proving discrimination remains with the plaintiff. She must demonstrate that the employer's reasons (each of them, if the reasons independently caused her employer to take the action it did, *Russell v. Acme–Evans Co.,* 51 F.3d 64, 69 (7th Cir.1995)) are not true. Moreover, if the company honestly believed in those reasons, the plaintiff loses even if the reasons are foolish or trivial or baseless. *See McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992) ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers.").

■ Navistar concedes that Kariotis has established a prima facie case of discrimination under the ADA, ADEA, and ERISA.[1] Therefore, the only issue is whether she successfully called into question Navistar's reasons for firing her. There is no dispute that Navistar says it fired Kariotis for disability fraud. From the company's perspective, the physical activities it saw Kariotis performing

---

1. Much of the plaintiff's prima facie case under each statute is the same. The plaintiff must show (1) she is a member of a protected group ("disabled" within the meaning of the ADA; aged 40 or older under the ADEA; and a "participant" or "beneficiary" under ERISA); (2) she was performing her job satisfactorily; and (3) she was discharged. The fourth elements of the prima facie case differ. Under the ADA, the plaintiff must demonstrate that the circumstances surrounding her discharge make it more likely than not she was fired because of her disability. *Weigel v. Target Stores,* 122 F.3d 461,

465 (7th Cir.1997). Under the ADEA, the plaintiff must show that substantially younger employees were treated more favorably. *Hartley v. Wisconsin Bell Inc.,* 124 F.3d at 892. In this circuit, "substantially younger" means at least a ten-year age difference; any age disparity less than ten years is "presumptively insubstantial." *Id.* at 893. There is no formal fourth element under ERISA, though in addition to establishing her discharge (the third element), the plaintiff also must point to circumstances allowing a reasonable inference that the defendant had the specific intent to discriminate. *Salus,* 104 F.3d at 135.

on the surveillance videotape equaled and perhaps even exceeded what she was asked to do on the job. In addition, Kariotis had lied (according to the company) when she told Vlcek that she could not grocery shop or walk straight before her second knee manipulation on June 28; the videotape showed her doing these things as early as June 17, eleven days before that manipulation.

At this juncture the burden Kariotis has to meet is well-established. To successfully challenge the honesty of the company's reasons she must specifically rebut those reasons. But an opportunity for rebuttal is not an invitation to criticize the employer's evaluation process or simply to question its conclusion about the quality of an employee's performance. Rather, rebuttal must include facts tending to show that the employer's reasons for some negative job action are false, thereby implying (if not actually showing) that the real reason is illegal discrimination. In other words, arguing about the accuracy of the employer's assessment is a distraction, see *Brill v. Lante Corp.*, 119 F.3d 1266, 1273 (7th Cir.1997), because the question is not whether the employer's reasons for a decision are *"right* but whether the employer's description of its reasons is *honest." Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir.1992).

Navistar fired Kariotis for disability fraud after commissioning a private firm to follow her activities while off-duty and videotape them. After viewing the tapes of Kariotis' activities, Vlcek concluded she was not suffering from physical problems that merited disability leave and decided to fire her. There is no question that Kariotis denies acting fraudulently. She points to the fact that Navistar never spoke with her physician concerning the extent of her injury. In fact the company terminated her on July 6 even though Kariotis' doctor notified the company that she could not return to work until July 11. The company did not even show the videotape to its own physician. At Vlcek's request, the company's doctor was scheduled to examine Kariotis on July 6, but that never happened. As soon as Kariotis showed up for the examination, she was ushered aside by Vlcek and fired. As far as Vlcek and

Navistar were concerned, the videotape spoke for itself. Obviously, Vlcek never took Kay Carroll up on her suggestion that the company confront Kariotis' doctor with the videotape.

■ From Kariotis' perspective, the company's investigation was "imprudent, ill-informed, and inaccurate." Its refusal to confirm its suspicions with its own doctor or with Kariotis' made it guilty of "knowing ignorance" (an oxymoron) and a "conscious disregard for any facts that would show whether Mrs. Kariotis was or was not disabled." Navistar's investigation hardly looks world-class. (Surely there are better ways to investigate an employee like Kariotis who is suspected of dishonestly extending her disability leave—better, that is, than clandestinely following her around and videotaping her.) Yet this investigation was the reason given for the discharge, and "a reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination." *Pollard v. Rea Magnet Wire Co., Inc.,* 824 F.2d 557, 559 (7th Cir. 1987). In short, "[n]o federal rule requires just cause for discharges." *Id.* at 558. Therefore, Kariotis' energy is misspent by attacking the company's decisional process, unless she could point to facts suggesting that the company investigated her differently because she was an older employee (she has claimed age discrimination), or because she was on disability leave. She offers no comparative evidence suggesting that the company would have been more careful before firing a younger employee or one not on leave though suspected of fraudulent activity. Instead, her main argument is that the company was careless in not checking its facts before firing her, and while that may be true, there is no evidence that the company approached her case differently than others. While the decision arguably was wrong, she has not shown it was based on illegal discrimination.

We were confronted with similar circumstances in *Pollard,* wherein Oliver Pollard, a black employee, asked for a one-week leave to attend a bodybuilding event, but his employer said no. The week of the event arrived, and Pollard called in to report that he

would not be showing up because of personal reasons and an ankle injury. When he did return to work, he claimed he had been absent because of his ankle but did not bring an explanation from his physician. He was suspended on the spot and later fired. At trial Pollard received a favorable verdict of race discrimination, but we reversed because at most the evidence suggested that his employer had made a mistake in firing him. The employer never actually proved that Pollard had lied about his ankle and had attended the bodybuilding event; in fact, the company's "investigation went nowhere." 824 F.2d at 559. In addition, the company fired Pollard in part because he failed to produce a physician's report, even though the company had no written rules establishing how employees could obtain permission to miss work and even though it never asked Pollard to bring in an excuse. Nevertheless, at most Pollard had established that his employer's business "was not well run," *id.* at 560, which did not help him because it appeared to be that way for all employees regardless of their race.

Just as we found in *Pollard,* it would have made sense for Navistar to have been more systematic in its investigation of Kariotis. Instead of speaking with Kariotis' physician, or having the company's doctor examine her, Navistar hired an investigator to observe her. Obviously it did not trust the information it was receiving from Kariotis' doctor; Vlcek wanted to see for himself what Kariotis was doing during her leave. He isn't a doctor, but he was her boss, so it was significant that after seeing the video he concluded (along with his own boss, Goldie), that Kariotis was collecting disability benefits even though she could perform her administrative job. Vlcek may have come to this conclusion rather impulsively; again, he did not honor Kariotis' work release from her physician because he thought the video "spoke for itself." But nothing in the record suggests that he came to the conclusion because Kariotis was (in her words) an "aging woman" or because she had (again, in her words) "severe physical problems that were costing Navistar money."

In the end, we are left with Kariotis' theory that the company's investigation was so impulsive and shoddy that it reeks of discriminatory intent—a theory that we rejected in *Pollard* on the ground that a federal court is not a court of industrial relations, and one which we again reject today. This is probably the classic case where a court must observe its limitations and "not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers," the laws barring discrimination do not interfere. *McCoy v. WGN*, 957 F.2d 368, 373 (internal citations omitted). The same principle dooms each of Kariotis' discrimination claims under the ADA, ADEA and ERISA.

Ordinarily, a plaintiff's failure to call into question the employer's reason for her discharge puts an end to her case. But Navistar offered a second reason for firing Kariotis: the videotape not only spoke for itself but it also contradicted Kariotis' representations to Vlcek concerning her physical activity while on leave. (We already have determined that Kariotis failed to call Vlcek's opinion of the tape into question.) It is clear from the record (and Navistar's briefs) that the perceived misrepresentation by Kariotis poisoned Vlcek's viewing of the tape, and that Vlcek fired her in large part because as he watched the videotape he concluded that Kariotis had lied to him. Moreover, it is impossible to untangle these reasons from one another; Navistar itself concedes they are "coupled" and should be taken "together." This means that Kariotis' claims still would survive summary judgment if she successfully called into question Vlcek's purported belief that she had lied to him. *Russell v. Acme–Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995) (a plaintiff must rebut each reason the employer gives for its decision only if each reason independently caused the employer to make the challenged decision; where the reasons are enmeshed, rebutting one reason will do).

Kariotis' purported "lie" comes out of her conversation with Vlcek in his office on June 30, less than a week before she was fired.

Both parties agree that Kariotis stated she could do physical things she could not do "before." Based on what he saw on the videotape—Kariotis shopping and walking around before her second knee manipulation—Vlcek interpreted Kariotis' statement to be a lie. But Kariotis says that she was not comparing her activity to what she recently could do before her second knee manipulation (on June 28); she was comparing her activity to what she could do before her initial knee surgery in March. From Kariotis' perspective, then, her statement was not a lie. What Kariotis meant to say is unimportant; at most she has proven that Vlcek misinterpreted her reference to "before." In her view he made a mistake that apparently should have prompted him to clarify her remarks. Kariotis conceded as much in her response to Navistar's proposed undisputed facts in the district court: "Kathleen Kariotis' statements that she could not walk straight 'before' were in reference to the time before [she] had knee replacement surgery. Responding further, ... Vlcek made no attempt to clarify what Kariotis meant." In hindsight it obviously would have been helpful if Vlcek had asked for clarification. But in that context his interpretation was plausible. It also would have been helpful if he had weighted her physician's opinion at least as much as his own. But whatever curious process a company employs to reach its decisions is irrelevant so long as nothing in the record suggests that the process is discriminatory-in this case, so long as no evidence suggests that older, disabled workers received much more scrutiny than others. Kariotis has not made this argument, nor does our own review of the record suggest it.

▌ That leaves us with Kariotis' claim under the Illinois Health Insurance Claim Filing Act, which the district court also dismissed under the *McDonnell Douglas* framework. We need not determine whether *McDonnell Douglas* should be applied whenever a state statute has an anti-retaliation provision because Kariotis' claim is so clearly preempted by ERISA. Her claim is that Navistar violated Illinois law by firing her for seeking medical and disability benefits under

Navistar's welfare plans. The Supreme Court has found that § 514(a) of ERISA expressly preempts state common laws protecting employees from wrongful discharge when the claim relates to an employee's rights under an ERISA plan. *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 140, 111 S.Ct. 478, 483–84, 112 L.Ed.2d 474 (1990). The result is no different where a state statute rather than common law fuels the claim. *See* 29 U.S.C. § 1144(c)(1) (preempted state "laws" include "all laws, decisions, rules, regulations, or other State action having the effect of law"). Not only does ERISA expressly preempt the Illinois state law claim, it impliedly preempts the claim as well by providing Kariotis with a remedy. By its terms, § 510 of ERISA protects plan participants from the retaliation Kariotis alleges; indeed, her state law claim is "prototypical of the kind Congress intended to cover under § 510." *Ingersoll–Rand Co.*, 498 U.S. at 143, 111 S.Ct. at 485. Consequently, Kariotis' state law claim must give way to her claim under ERISA, *id.* at 145, 111 S.Ct. at 486, which we already have concluded was properly dismissed.

## III.

We have concluded that an employer who honestly believes it is firing a fraudulent employee may not be liable for intentional discrimination. Under Title VII, the ADA, the ADEA, and ERISA, an employer's honest belief is critical; it is not liable under a disparate treatment framework because its decisions (and suspicions) happen to work to the disadvantage of a member of a protected group. Liability results only if the employer *intends* to disadvantage an individual precisely because he belongs to a protected group.

▌ In analyzing Kariotis' COBRA[2] claim, however, we must take a different approach. While antidiscrimination statutes compel us to discern an employer's intentions, COBRA does not. It is a welfare benefit statute, not a wrongful discharge statute. All employees are protected by its terms, not just those who fall into special

---

2. Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1161 *et seq.*

classes. And while COBRA allows an employer to refuse continued health coverage if an employee is terminated for "gross misconduct" (meaning the employee is no longer a "qualified beneficiary" under 29 U.S.C. § 1163), what if the perceived gross misconduct turns out to be a mistake? Where the statute's language is plain, the court's function is to enforce it according to its terms. *See Pittway Corp. v. United States*, 102 F.3d 932, 934 (7th Cir.1996).

Navistar would have us allow the "honest belief" rule to defeat Kariotis' COBRA claim just as it defeated her discrimination claims. It is not an unreasonable argument; indeed, we have invited it while reserving judgment on it for another day. *See Mlsna v. Unitel Communications, Inc.*, 91 F.3d 876, 883 (7th Cir.1996) ("[Defendant's] argument that [under COBRA] it only needed a good faith basis for its determination that [the plaintiff] committed gross misconduct meriting termination is interesting and does have a certain resonance with both traditional and modern concepts of employment law, particularly discriminatory discharge law, but we need not decide the issue here.").

With the issue now squarely before us, we conclude that COBRA requires more than a good faith belief by the employer. Discrimination statutes allow employers to discharge employees for almost any reason whatsoever (even a mistaken but honest belief) as long as the reason is not illegal discrimination. Thus when an employee is discharged because of an employer's honest mistake, federal anti-discrimination laws offer no protection. Likewise, when an employer discharges an employee because of inefficient work habits, excess absenteeism, an unacceptable attitude with customers and coworkers, or for a myriad of other reasons, anti-discrimination laws do not come into play. But in each of these instances, where gross misconduct is not involved, the terminated employee retains the option under COBRA of continuing medical insurance coverage by individually paying the designated premiums. COBRA relieves an employer (and plan sponsor) from its obligation to provide continued health care coverage only in very limited circumstances, such as a termination prompted "by reason of . . . gross misconduct." 29 U.S.C. § 1163(2). We do not interpret this language as referring to the employer's articulated reason or explanation for the employee's discharge. It refers to the fact (not the suspicion) of gross misconduct. In other words, the employer's belief that the employee engaged in gross misconduct must be more than its honest, actual belief—the record must demonstrate that the employee did indeed engage in gross misconduct.

In this case, the record demonstrates that Navistar honestly believed Kariotis was misusing her leave. But Navistar could have been mistaken. As Kariotis points out, the company's doctor did not examine her, nor did the company show the videotape to the physician who had excused Kariotis from work. Kay Carroll's suggestion made sense—simply ask Kariotis' doctor whether anything in the videotape changed his mind about Kariotis' condition. Navistar did not do that, and no other evidence comes close to *proving* Kariotis to be a fraud (and thus to have engaged in gross misconduct). Navistar's honest belief means that she cannot make a federal case about losing her job, but more is required to deprive her of her federally guaranteed COBRA benefits. If a discharged employee can demonstrate to the court that the employer was mistaken—that the employee had not engaged in gross misconduct—the employee should not be deprived of COBRA coverage under §§ 1161 and 1163. Accordingly, if Kariotis can show that Navistar's honest belief was wrong, her COBRA benefits should be restored.

## IV.

Kariotis' final claim lies under the Family and Medical Leave Act of 1993. In a nutshell, she claims that Navistar violated the return-to-work provisions of the Act when it refused to reinstate her. Kariotis is correct to say that under the FMLA an employee on leave from work "for the intended purpose of the leave" must be restored to her position (or an equivalent position) once the leave expires. *See* 29 U.S.C. § 2614(a)(1). The problem for Kariotis is that Navistar has demonstrated that it honestly believed she

was not on a legitimate FMLA leave; or, tracking the language in the statute, Navistar suspected Kariotis was not using her leave for its "intended purpose" of recovering from knee surgery.

Unlike Kariotis' COBRA claim, Navistar need not conclusively prove that Kariotis had misused her leave; an honest suspicion will do. This is because the FMLA's regulations plainly state that an employee like Kariotis has "no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a). In other words, because Navistar lawfully could have terminated Kariotis after suspecting she committed fraud while on duty, the company can discharge her after suspecting she committed fraud while on leave. If Navistar had to prove more than an honest suspicion simply because Kariotis was on leave, she would be better off (and enjoy "greater rights") than similarly situated employees (suspected of fraud) who are not on leave. The statute and the regulations rule out that inequity.

### V.

Navistar honestly suspected fraud on the part of Kariotis, and while that is sufficient to defeat most of her claims, COBRA is different. Accuracy must take the place of honesty under that statute. Accordingly, the dismissal of each of Kariotis' claims is AFFIRMED, with one exception: the dismissal of the COBRA claim is REVERSED, and that claim is REMANDED to the district court for further proceedings. Of course, reinstating the COBRA claim means that the district court now has jurisdiction over Kariotis' pendent state law claim for negligent infliction of emotional distress. In declining to exercise jurisdiction over that claim, the district court hinted that the common law claim might be preempted (by the Illinois Human Rights Act, or perhaps even by Illinois' Workers Compensation Act). We express no opinion on the matter; it is best left to the district court in the first instance.