Laverne PERKINS, Plaintiff–Appellant,

v.

G.E. CAPITAL AUTO FINANCIAL
SERVICES, INC., Defendant–
Appellee.

No. 00–2029.

United States Court of Appeals,
Seventh Circuit.

Argued March 6, 2001.

Decided March 19, 2001.

Before FAIRCHILD, CUDAHY, RIPPLE, Circuit Judges.

## ORDER

General Electric Capital Auto Financial Services, Inc. ("G.E. Capital") rejected former employee Laverne Perkins's application for an open position. Believing she was passed over because she is African–American, Perkins sued G.E. Capital for race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. The district court granted summary judgment in G.E. Capital's favor after it concluded that Perkins failed to demonstrate that G.E. Capital's legitimate, non-discriminatory reasons for refusing to hire her were pretextual. Perkins appeals, and we affirm.

## I.

G.E. Capital is an automobile financing service and subsidiary of General Electric located in Barrington, Illinois. Perkins began working at G.E. Capital as a Collections Representative in 1986. She holds a Certificate in General Office Work from Trainco Business School in Joliet, Illinois and an Associates Degree from Triton College in River Grove, Illinois. General Electric paid for Perkins to attend management courses at Elgin Community College in Elgin, Illinois. By 1997 she received at least three lateral transfers or promotions and held the position of Repre-sentative in the Customer Interactive Unit, or CIU. Each of her positions at G.E. Capital generally involved similar responsibilities: telemarketing, collections, answering customer calls, and persuading lessees to purchase outright or sell their leased vehicles to third parties at the end of their leases. Over the years Perkins received several awards based on her sales abilities and commitment to "G.E. Values."

CIU Representatives were required to meet incoming call targets by answering a certain number of customer calls each day. In a March 1997 performance review, CIU Supervisor Dirk Pallagi rated Perkins's performance as average, and noted that her attendance and ability to meet incoming call targets needed improvement. Although Pallagi believed that Perkins had improved her "phone productivity" over time, he commented that she was not meeting her incoming call targets during regular work days.

Shortly after her performance evaluation, G.E. Capital created the Consumer Sales Unit, or CSU. The CSU was supervised by Director of Consumer Sales Sandee Lembke and was comprised of several teams of Customer Sales Telemarketers on temporary assignment from other departments. Around this time Perkins applied for and was hired to be a Customer Support Specialist at G.E. Technology Management Services ("G.E. Technology"), another division of General Electric. G.E. Technology financed computer equipment leases in much the same way that G.E. Capital financed automobile leases. Perkins's new job paid better, but in most respects resembled her last position with G.E. Capital. After Perkins gave G.E. Capital her two-week resignation notice, Lembke asked her whether she could work part-time in the CSU. Perkins initially expressed interest in this arrangement, but working both jobs later proved impractica-

ble. Perkins began working at G.E. Technology on May 25, 1997.

In September 1997, Perkins learned that General Electric planned to sell G.E. Technology to another firm. She wanted to stay with General Electric and contacted Lembke to find out if any positions were available. Lembke, however, no longer supervised the CSU, so she directed Perkins to contact Sara Foster, the new CSU Supervisor. Foster is Caucasian. Foster informed Perkins that G.E. Capital was under a hiring freeze and that she could not hire anyone from outside of the company. But shortly after this conversation, G.E. Capital lifted the hiring freeze and created several new CSU Telemarketer positions. The Job Posting for the new positions stated that applicants were required to have experience with lease and retail contracts; excellent communication skills; knowledge of "residual loss mitigation efforts"; excellent sales and negotiation skills; previous telemarketing experience; and participation in "call quality and performance management." The Posting also noted several preferred qualifications: a college degree or equivalent; credit experience; and operations experience.

Perkins learned of the new CSU openings in early October. She immediately e-mailed Foster and asked whether the new positions were open to outside applicants. Foster noted that Perkins's message contained several typographical and grammatical errors, but she responded and advised her to submit her resume. In a reply, Perkins expressed her gratitude for the opportunity to rejoin the company. Foster noted that Perkins misspelled "grateful" in her response. A week later, CSU Team Leaders Connie Young and Lucy Krchak, both of whom Perkins knew and had previously worked for, interviewed Perkins. Young and Krchak asked Perkins why she wanted to return to G.E. Capital.

Perkins recalls explaining that she found her G.E. Technology job lacking in structure and performance standards. Young and Krchak, however, remembered Perkins's remarks differently. In their view, Perkins launched into a lengthy complaint about her current job. Young and Krchak had also prepared several typed questions to ask Perkins during the interview regarding specific performance aspects of the CSU job. But because Perkins already had experience in the position, Young decided that asking Perkins to answer the questions would be unnecessary.

After the interview, Young and Krchak relayed their impressions to Foster. They told Foster that they found Perkins's complaints about her job off-putting. Young also told Foster that she was aware from her pervious experience that Perkins had attendance problems. Foster instructed Young and Krchak to speak with Dirk Pallagi. Pallagi told them that Perkins's performance was inconsistent, that she required more time to meet her targets than other employees, and that she was unreceptive to feedback and constructive criticism. Foster also spoke with Barbara Gick, Pallagi's former manager, who confirmed Pallagi's statement that Perkins had attendance problems and difficulty meeting targets.

While Foster was gathering information about Perkins, Perkins became impatient and sent e-mail messages to G.E. Capital's President Sandra Derickson and National Director Geoff Klass complaining that she had not been contacted following her interview. Like her previous e-mails, both messages contained typographical and grammatical errors. Perkins's message to Derickson also stated "I'm ruling out the race issue because I choose not to [believe] this is the issue. However, I would appreciate if someone would respond to me that has enough [intelligence] not to insult me!"

Derickson asked Foster to update Perkins, and Foster called Perkins and told her that the hiring process was taking longer than expected.

Based on what she had observed in Perkins's submissions and e-mail messages, and what she had learned in her discussions with Young, Krchak, Pallagi, and Gick, Foster decided not to hire Perkins and informed Perkins of her decision on November 14, 1997. For various reasons, Foster also rejected ten other applicants, most of whom were Caucasian and several of whom had previously worked or were currently working at G.E. Capital. After Foster's decisions, Human Resources Manager Beth Hubbard prepared an "Applicant Flow Log," a form used to track information about job applicants such as their race and current employment status. The Flow Log here shows that Perkins was the only African–American applicant (but not the only non-Caucasian applicant). In one column of the Flow Log, six numerically coded explanations were used to note the reasons for an applicant's rejection: "inadequate interpersonal skills"; "interests or objectives inappropriate to match job requirements"; "technical experience not strong enough"; "salary expectation too high"; "applicant not pursued-explanation required"; and "other-explanation required." This Flow Log shows that Perkins was rejected for "inadequate interpersonal skills." No applicant was rejected for the catch-all reason labeled "other."

Foster then selected applicants Shirley Orozco, Tracie Waibel, Michael Kent, and Matthew Woppert for the open positions. All four individuals are Caucasian. Shirley Orozco was already employed in the CIU. Her resume stated that she held an Associates Degree in Nursing and had prior work experience at a bank and a supermarket. Tracie Waibel was also already employed in G.E. Capital's Collections Department. Her resume listed prior telemarketing and customer service experience with a credit card company. Michael Kent was an Account Executive in another G.E. subsidiary, but before that had worked seven years at G.E. Capital. Matthew Woppert stated on his resume that he had been employed as a Customer Accounts Representative with Volkswagen Credit Corporation. Young and Krchak, who had interviewed the four successful applicants, told Foster that each had interviewed well and displayed enthusiasm for the job. Young and Krchak also told Foster that they believed each candidate would make a good salesperson.

Perkins filed charges of race discrimination with the Equal Employment Opportunity Commission and the Illinois Human Rights Commission, received a right-to-sue letter, and timely filed her complaint in the district court. G.E. Capital moved for summary judgment, arguing that its decisionmaker, Sara Foster, had legitimate, non-discriminatory, and honestly held reasons for rejecting Perkins's application. The district court granted the motion on March 21, 2000, concluding that Perkins failed to identify any evidence in the record raising an inference that she was passed over because of her race.

## II.

We review *de novo* the district court's decision to grant summary judgment. *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 610 (7th Cir.2001). Summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions, and affidavits leave no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Id.;* Fed.R.Civ.P. 56(c).

Perkins has framed her issues on appeal as evidentiary questions, but under each

issue she addresses only one principal argument: there exists a triable issue of material fact whether Sara Foster, G.E. Capital's decisionmaker, honestly believed her reasons for rejecting Perkins's application. Foster stated during her deposition that she rejected Perkins's application because Connie Young and Lucy Krchak told her that Perkins did not interview well; Dirk Pallagi and Barbara Gick told her that Perkins had attendance problems and did not respond to constructive criticism well; and Foster formed a negative impression of Perkins based on her poorly drafted e-mail messages. The district court found these reasons to be legitimate and concluded that Perkins failed to identify any evidence in the record suggesting that Foster did not honestly believe her stated reasons. Perkins argues, however, that G.E. Capital's own business records contradict Foster's excuses for rejecting her; most of the evidence supporting Foster's excuses would have been inadmissible at trial; and the evidence, viewed in the light most favorable to Perkins, raises an inference that Foster rejected Perkins because of her race.

 In the district court, Perkins relied on the indirect, burden-shifting method of proof articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that framework she was first required to establish a prima facie case of discrimination by demonstrating that she belongs to a protected class; she was well-qualified for the position; she was rejected for the position; and the position was given to an applicant of a different race who had similar or lesser qualifications. *Malacara v. City of Madison,* 224 F.3d 727, 729 (7th Cir.2000). If Perkins established her prima facie case, the burden shifted to G.E. Capital to articulate a legitimate, non-discriminatory reason for hiring the other

applicants rather than her. *See McDonnell Douglas,* 411 U.S. at 802. And if G.E. Capital met its burden of production, it is entitled to summary judgment unless Perkins identified evidence in the record demonstrating that G.E. Capital's reason was pretext for unlawful discrimination. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Oest,* 240 F.3d at 612–13. G.E. Capital focused its summary judgment motion solely on the issue of pretext. We will assume that Perkins could have established her prima facie case of employment discrimination and proceed directly to the question of pretext.

 "Pretext" means a lie or a phony reason for taking an adverse action. *Richter v. Hook–SupeRx, Inc.,* 142 F.3d 1024, 1029–30 (7th Cir.1998); *Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir. 1995). An otherwise legitimate excuse is not pretextual if it is foolish, trivial, or even baseless, so long as the decisionmaker honestly believed it when taking the adverse action. *Debs v. Northeastern Illinois Univ.,* 153 F.3d 390, 396 (7th Cir. 1998); *Hartley v. Wisconsin Bell, Inc.,* 124 F.3d 887, 890 (7th Cir.1997). If an employer offers multiple reasons for its adverse employment decision, the plaintiff must demonstrate that each reason is pretextual in order to survive summary judgment. *Ghosh v. Indiana Dep't of Environmental Mgt.,* 192 F.3d 1087, 1092–93 (7th Cir.1999).

 Perkins first argues that the Applicant Flow Log completed by Beth Hubbard is a "business record" presumed to be correct under Federal Rule of Evidence 803(6). As such, she asserts, it is inconsistent with Foster's testimony because "inadequate interpersonal skills" was not one of Sara Foster's stated reasons for rejecting her, and thus raises an inference that Foster did not honestly hold her beliefs.

Perkins introduced the Applicant Flow Log at Foster's deposition and asked Foster whether she rejected Perkins's application due to her interpersonal skills. Foster answered that she did not, but that she believed Perkins failed to demonstrate sales experience or present herself positively during her interview. Foster also noted that Young and Krchak had reported that Perkins spoke poorly about her current employer, and that Gick and Pallagi had advised her of Perkins's inability to consistently meet her targets while employed at G.E. Capital. Foster also testified that she explained her reasons for rejecting Perkins to Hubbard, but never personally reviewed Hubbard's entries on the Applicant Flow Log.

We believe Foster's stated reasons are consistent with "inadequate interpersonal skills." Foster testified that she formed a negative impression of Perkins from reading her poorly drafted e-mail messages, and the term "interpersonal skills" encompasses the ability to communicate clearly with customers. "Inadequate interpersonal skills" is the only category consistent with Foster's explanation, and it appears that the catch-all reason "other" was not used for any applicants tracked on this Flow Log. Moreover, the Applicant Flow Log was not a business record made by Sara Foster, and statements made by non-decisionmakers generally are insufficient to raise an inference of discrimination. *See Larimer v. Dayton Hudson Corp.,* 137 F.3d 497, 500 n. 4 (7th Cir.1998); *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1400 (7th Cir.1997). Perkins points out, however, that Foster relied on the Applicant Flow Log in preparing an affidavit that G.E. Capital submitted with its summary judgment motion. Thus, Perkins argues, Foster cannot credibly deny her participation in the creation of the Flow Log. But it is clear that Foster's reference to

the Applicant Flow Log was limited to verifying the number and names of candidates who applied for the open CSU positions, not to recall her reasons for rejecting Perkins. Therefore, Foster's reference to the Applicant Flow Log does not affect her credibility.

■ Perkins next contends that much of the negative information about her in the record is unreliable hearsay that would not be admissible in a trial and should not have been considered by the district court. *See* Fed.R.Civ.P. 56(e). Specifically, she cites Young and Krchak's statements to Foster that Perkins interviewed poorly and had a poor attendance record, and that Orozco, Waibel, Kent, and Woppert all interviewed well; and Pallagi's statement to Young that Perkins had a poor attendance record, as well as difficulty meeting goals or accepting constructive criticism. But the statements of Young, Krchak, and Pallagi were not offered for their truth. All of these statements demonstrate how Foster formed her opinion about Perkins, what she may have relied upon when she decided not to hire her, and whether Foster honestly believed her stated reasons. Thus, they are not hearsay. *Woods v. City of Chicago,* 234 F.3d 979, 986 (7th Cir. 2000); *Stewart v. Henderson,* 207 F.3d 374, 377 (7th Cir.2000).

■ Finally, Perkins attacks Sara Foster's excuses for not hiring her, arguing that the record demonstrates that they cannot be her honestly-held beliefs. The crux of Perkins's argument is that she was clearly better qualified for the positions based on her resume and prior experience with G.E. Capital. She points out that she had a better educational background than the successful candidates and more relevant experience. G.E. Capital never seriously disputed that Perkins was generally qualified for the job, but even if they did

we cannot tell whether Perkins's qualifications were "clearly" better than Waibel's or Woppert's. *Cf. Bell v. EPA,* 232 F.3d 546, 551 (7th Cir.2000). The relative merits of each candidate and the subjective impressions they conveyed to the decision-maker are the kind of facially legitimate employment decisions that federal courts will not reexamine. *See Wade v. Lerner New York, Inc.,* 243 F.3d 319, 324–25 (7th Cir.2001); *Ritter v. Hill 'N Dale Farm, Inc.,* 231 F.3d 1039, 1044 (7th Cir.2000).

Perkins also argues that her poorly-drafted e-mail messages could not have lowered Foster's opinion of her because Foster herself misspelled a word in one response and allegedly misused several commas; fellow applicant Tracie Waibel misspelled several words on her application; and good spelling was not a listed qualification for the job. Perkins points out that her recollection of her interview differs "radically" from that of Young and Krchak, and argues that the basis of Young's and Krchak's impression is a material issue of fact for trial. She contends that G.E. Capital's concern with her attendance was unfounded, noting that she was never disciplined for poor attendance and that Foster once told her that her absences did not influence her decision whether to hire her. Lastly, she argues that Foster investigated her background more intensely than the successful candidates by noting that Matthew Woppert was later terminated for misconduct and that her attorney's investigation during this case revealed that Woppert may have submitted false information on his resume.

 The question of pretext turns on whether the decisionmaker honestly believed her reasons for making an adverse employment decision, not whether those reasons were wise, well founded, or correct. *See Wade,* 243 F.3d at 322–23; *Bell,* 232 F.3d at 550; *Debs,* 153 F.3d at 396;

*Hartley,* 124 F.3d at 890; *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992); *Pollard v. Rea Magnet Wire Co.,* 824 F.2d 557, 559 (7th Cir.1987). Foster's expectations may have been unreasonably high, foolish, or trivial, but they were legitimate. *Cf. Baron v. City of Highland Park,* 195 F.3d 333, 341 (7th Cir.1999) (poor interview is legitimate reason for failure to promote employee). Perkins's recollection of her interview, if true, calls into question only the correctness of what was reported to Foster, not Foster's truthfulness. Likewise, whether G.E. Capital considered her alleged absenteeism to warrant discipline suggests only that Foster may have held higher standards than her predecessors. Perkins's remaining arguments are irrelevant to the pretext analysis. Foster testified that she never personally read Tracie Waibel's resume prior to hiring her and thus could not have been aware of her alleged spelling errors. And whether Woppert's hiring ultimately turned out to be sound has nothing to do with Foster's honest reasons for not hiring Perkins.

### III.

Laverne Perkins has not demonstrated that G.E. Capital's legitimate, non-discriminatory reasons for rejecting her were pretextual. We therefore agree with the district court that no genuine issue of material fact for trial exists. The judgment of the district court is AFFIRMED.