Martha E. **RUDOLPH**, Plaintiff,

v.

Robert E. **RUBIN**, Secretary of the Treasury, Defendant.

No. IP 97–1814 C M/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 12, 1999.

Roger P. Ralph, Ricos & Price, Indianapolis, IN, for plaintiff.

Tim A. Baker, Asst. U.S. Attorney, Office of the United States Attorney, Indianapolis, IN, for defendant.

## ORDER on MOTION FOR SUMMARY JUDGMENT

MCKINNEY, District Judge.

The defendant, Robert E. Rubin, Secretary of the Treasury ("Customs"), has brought a motion for summary judgment against the plaintiff, Martha E. Rudolph ("Rudolph"). Rudolph has filed a complaint claiming that the defendant violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., when her employer, the Customs Financial Services Center[1] failed to promote her to a GS–14 accounting position. Customs maintains that Rudolph has not established a prima facie case of discrimination or offered evidence that allows for the inference of pretext. The issues have been fully briefed by counsel and are ready to be resolved. For the reasons stated herein, the Court now GRANTS the defendant's motion for summary judgment.

## I. FACTUAL & PROCEDURAL BACKGROUND

Rudolph, who was fifty-nine years old at the time of the employment selection at issue, has been a Customs' employee since 1989. Prior to coming to Customs, Rudolph originally worked as an interior designer and then worked for many years for the State of Indiana. Rudolph Dep. at 19–22. She began her state employment in 1969 as an administrative assistant to Republican Lieutenant Governor Richard E. Foultz. Id. at 21. In 1971, she became a bookkeeper in that office. Id. 21–23. As a bookkeeper she was responsible for bookkeeping, personnel matters, tourism and general services. Id. at 23. In 1973, Rudolph became the Director of Accounting and Personnel in the Lieutenant Governor's Office. Id. at 29. As Director, Rudolph had the responsibility of supervising six accountants, five professionals, and ten clerks. Id. at 35. From 1981 until 1989, Rudolph served as Controller in the Lieutenant Governor's office, supervising ten accountants, three professionals, and four clerks. When Evan Bayh, a Democrat, took over the Office of Governor, Randolph, the Controller of the Lieutenant Governor's Office was out of a job.[2] Id. at 34.

After applying in March of 1989, Rudolph was hired into the Accounting Services Division of Customs as a GS–12 operating accountant on September 18, 1989. Id. at 69. At that time, Rudolph was fifty-two years old. Id. at 83. Between 1989 and 1992, Rudolph had been detailed to temporary promotions at the GS–13 level but then returned to her GS–12 position. On December 27, 1992, Rudolph was permanently promoted to a GS–13 level and remained in that position. From 1991 until 1996, Rudolph was responsible for managing delinquent debt collection. Id. at 130–133. In this role, Rudolph had to assist in creating a data base that identified each debt by date, account number and dollar in descending order. Id. at 130–31. At

---

1. Customs is a bureau of the Department of the Treasury. Smith Dec. ¶ 1.

2. Although Rudolph disputes that her employment in the Lieutenant Governor's Office was a political appointment, Rudolph acknowledged that when the Democrats took office, her position was going to be filled by a Democrat appointee. Rudolph Dep. at 32–34. She also explained that her original appointment to a position in the Lieutenant Governor's Office came through social contacts she and her first husband, an avid Republican supporter, had with people in the Republican Organization. Id. at 26.

the time of the deposition, Rudolph was a GS–13 staff accountant responsible for specialty projects including the review of different processes in payroll associated with the leave share and military leave programs. *Id.* at 108–09.

Rudolph does not have an accounting degree and has little formal accounting training, having attended her last accounting-related workshop or seminar in 1985. *Id.* at 38–39, 212; Def.'s Ex. 2. She is not a Certified Public Accountant ("CPA") or a Certified Government Financial Manager, nor has she attended the Becker Review course or completed the Federal Accounting I–USDA self-study course. Rudolph Dep. at 200–05, 213. However, Rudolph received routine pay increases and favorable performance evaluations throughout her employment with Customs, though Rudolph was not satisfied with her last few evaluations prior to her deposition. *Id.* at 93–94. In the past, Rudolph's work had earned her performance and cash awards, including the "Commissioners Award" in 1993 for her work on the delinquent debt collection. *Id.* at 93, 134; Accetturo Aff. at 2.

In April of 1996, the Department of the Treasury issued a vacancy announcement for seven "Supervisory Operating Accountant" positions under the number HEADQ/96–047VLD. Def.'s Ex. 6. According to Customs, these positions were created in order to comply with the Chief Financial Officer Act of 1990 ("CFO Act"). The purpose of the Act was to "establish Federal accounting standards, integrate and modernize the Government's financial systems and produce audited financial statements." Def.'s Ex. 3. In a June 15, 1994, report from the United States' General Accounting Office ("GAO") regarding the results of the GAO's efforts to audit the U.S. Customs Service for the 1993 fiscal year, the GAO identified financial management problems and many areas where Customs needed improvement in complying with the CFO Act. Def.'s Ex. 4. The GAO recommended that the Commissioner "evaluate the technical proficiency and experience of existing staff under the CFO to determine the specific staff needs for effectively addressing Customs' financial management problems." *Id.* at 4. Because of problems with their financial statements, Customs could not be audited in 1992, 1993 or 1994. Smith Dec. ¶ 8. The Commissioner of Customs, George J. Weise (Weise") offered Customs' comments on the draft of the June 15 report in a letter dated June 2, 1994. Def.'s Ex. 5. In that letter, Weise explained that Customs had established a Steering Committee to oversee the "improvements in the financial and technical operations necessary to integrate CFO requirements into our daily operations." Def.'s Ex. 5 at 1. Weise also wrote:

> Technical proficiency for CFO staff. Customs is actively recruiting for additional staff to supplement current resources dedicated to CFO activities. The recruitment is targeted to candidates with strong accounting backgrounds, many of whom will be Certified Public Accountants. At least 12 new employees are being hired, with the first-half on-board by the end of FY 94; the second group will be hired during FY 95. In addition, with the appointment of a new Chief Financial Officer, we plan to review the entire Customs organization for CFO Act implementation, including field responsibilities.

*Id.* at 4.

Rudolph applied for one of the GS–14 level supervisory operating accountant positions announced in April of 1996. According to the vacancy notice, one of the main duties of the position was to advise on the day-to-day management of accounting systems and procedures relating to such areas as Accounts Receivable, Accounts Payable or Financial Reporting and Analysis. Def.'s Ex. 6. The notice informed applicants that in addition to having fifty-two weeks of experience equivalent to the next lower grade level, they needed to have the appropriate amount of general and/or specialized experience as required by the published Office of Personnel Management qualifications standards.[3]. *Id.* Informing the applicants that they would be

---

3.  The Court was not provided with a copy of the requirements from the Office of Personnel Man-

agement standards.

"evaluated against the following criteria," the notice listed the primary criteria as

1. Knowledge of accounting theories, standards, concepts and practices.

2. Ability to analyze financial information and present it for decision making and reporting purposes.

3. Ability to manage integrated financial management and accounting systems.

4. Ability to manage human resources, including planning, directing, and evaluating the work of others, individually and in teams.

*Id.* The secondary criteria included "1. Ability to communicate orally and in writing. 2. Ability to effectively promote Equal Opportunity programs." *Id.* According to the Credit Plan, the primary criteria were scored with a 6.0 for an excellent level, a 4.5 for a good level and a 3.0 for a moderate level. The secondary criteria were scored with a 4.0 for an excellent level, 3.0 for a good level, and 2.0 for a moderate level. Plf.'s Ex. D; Def.'s Ex. 7.

According to Judy Allen ("Allen"), who at that time was the liaison between Customs' headquarters in Washington D.C. and the Customs Financial Management Service Center for personnel and budget activities, the applications for the vacancy position were received and reviewed at Customs' headquarters. The applications were then referred to Allen, and she subsequently assembled the interview panel. Allen Dec. ¶ 2. Before forwarding the applications to the interview panel, she made sure each application was complete. *Id.* After the interviews were held and the recommendations were made for selections, the applications were sent back to Allen who forwarded the information to the selecting official at Customs' headquarters. *Id.*

The parties have not been clear on when the "Evaluation Board Rating Sheet," which listed the points for the individual criteria categories as well as the total points for each applicant, was completed or who scored the applicants Def.'s Ex. 7. Presumably, the board members who signed the form conducted the evaluation of the applicants based on the application materials submitted by each applicant. The results were recorded on the Rating Sheet. *Id.* Nine applicants were marked as "highly qualified" and placed on a "Best Qualified Candidate" list in rank order according to their evaluation scores. Def.'s Ex. 10. Rudolph had the highest total score with 28.[4] Def.'s Ex. 7.

Those nine applicants were then interviewed by a panel of group leaders consisting of John Accetturo ("Accetturo"), Bob Hamilton ("Hamilton") and Tom Smith ("Smith"). Def.'s Ex. 13, 15, & 16. Because one of the candidates was selected to fill a position in the Financial Systems Division shortly after his interview, the panel considered the remaining eight applicants for the seven positions. Smith Aff. Following the interviews, the panel recommended that Judy Starling ("Starling"), age thirty-six, Dave Sims ("Sims"), age fifty-three, Fred Petre ("Petre"), age fifty-two, John Ulrich, age forty-eight, and Pam Miller, age thirty-two, be selected for the positions. *Id.;* Rudolph Dep. at 88. All of those applicants have college degrees and four of the five are also CPAs. Def.'s Ex. 11. Starling, who was not a CPA, had completed the Becker CPA Review Course. *Id.* at B. The panel did not select Rudolph. The recommendations were made to Tom Diaforli ("Diaforli"), the recommending official for the vacancy. Rudolph Dep. at 84, 86. Diaforli had the option of rejecting the panel's recommendations, but he adopted their recommendations in full. *Id.* at 86, 159; Diaforli Aff. Therefore, Rudolph was not chosen for any of the vacancies.

Following her non-selection, Rudolph wrote a grievance letter to Vincette Goerl ("Goerl"), the Assistant Commissioner in the Office of Finance. Def.'s Ex. 12. Rudolph complained that the panel did not fairly evaluate her because Accetturo and Hamilton subjected her to prejudicial professional bias and retaliation. *Id.* She claimed that past projects and studies that she had been involved with brought to light the deficiencies that had developed under Accetturo's and Hamilton's management. *Id.* In her opinion,

---

4. No affidavit was attached to either copy of the Evaluation sheet provided to the Court. Technically, without a supporting affidavit, the information contained in the evaluation is hearsay if it is being offered to prove the truth of the matter asserted: that Rudolph received the highest overall score from the Evaluation Board.

her "job-related efforts further revealed deficiencies in the financial management of their function." *Id.* At that time, Rudolph also alleged that her age and sex were factors in the selection process.

A subsequent vacancy notice was posted for one or more supervisory operating accountants, numbered HEADQ/96–145VLD. Def.'s Ex. 14. The requirements for that position included a degree in accounting, or a related field under certain restrictions, or a "combination of education and experience-at least 4 years experience in accounting or an equivalent combination of accounting experience, college-level education, and training that provided professional accounting knowledge." *Id.* Rudolph resubmitted her previous application for this vacancy. Rudolph Dep. at 159. She was interviewed by Smith, Accetturo, Hamilton and Ivan Lawson, who had previously been in the running for the first vacancy positions but was selected to the position through a different vacancy announcement. Def.'s Ex. 13 at 1.

Rudolph was not selected for this vacancy. The selection register offered by Rudolph indicates that Rudolph's evaluation score gave her a ranking of second going into the interview process. Plf.'s Ex. E. The applicant who was ranked first on that list, Tina Harmon, also was not selected. *Id.* Instead, Egardo Aviles, age thirty-two, a CPA, and Gerald Slazman, age thirty-eight, were selected. Both had lower evaluation scores than Rudolph's original score of twenty-eight. In her deposition testimony, Rudolph admitted that she did not take the second interview as seriously as she could have because she "had every reason to believe the positions had been preselected, due to the 'idle common talk around the building.'" Rudolph Dep. at 162. Rudolph filed an EEO complaint with the Treasury Department on September 24, 1996. She alleged that Customs discriminated against her on the basis of her age and gender. When Rudolph filed her complaint with this Court, she alleged only a violation of the ADEA.

## II. STANDARDS

According to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 997 (7th Cir.1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *JPM Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir.1996).

## III. DISCUSSION

### A. SUMMARY OF ARGUMENTS

Customs argues that Rudolph has failed to establish a prima facie case of discrimination. Highlighting that two of the employees who were granted the promotion were only six and seven years younger than Rudolph, Customs maintains that Rudolph cannot satisfy the fourth prong of the ADEA prima facie case because she cannot demonstrate that those chosen for the position were substantially younger. Customs rejects Rudolph's notion that the measure of whether the chosen employees were substantially younger comes from the average age of those awarded the job. However, Customs contends that even if Rudolph can produce a prima facie case, it has offered a legitimate nondiscriminatory reason for the not choosing Rudolph. In support of this claim, Customs cites to the answers given by Rudolph during her interview and to her lack of formal education or certification in accounting. Customs also maintains that Rudolph has failed to offer any evidence that demonstrates that its given reason is pretext for discrimination.

Rudolph argues that she has established a prima facie case of discrimination because the evidence shows that the average age of the employees chosen for the promotion during both vacancies was 41.6. She maintains that the 17.4 year difference between that average and her age of fifty-nine demonstrates that those selected were substantially younger. Rejecting the Customs' given reason for her non-selection, Rudolph asserts that the reason is a pretext for age discrimination. She maintains that Customs' attempt to characterize a then six year old CFO Act as urgent raises a cloud of suspicion around the given reason for the non-selection. Furthermore, Rudolph asserts that nothing in the CFO Act precluded her selection, nor did Customs make clear any legislative mandates regarding the quality or importance of accounting skills or education in the application or interview processes. Relying on her high score in the evaluation process, Rudolph contends that Customs' claim that she failed to demonstrate sufficient accounting knowledge in her interview is a contradiction that raises an inference of pretext. Lastly, she argues that Customs hiring of the new supervisory operating accountants from within, instead of hiring additional staff as was referenced in a letter to the GAO, supports her pretense argument.

### B. ANALYSIS

■ Under the ADEA, an employer cannot discriminate with respect to compensation, terms, conditions, or privileges of employment "because of [an] individual's age." 29 U.S.C. § 623(a); *see also Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 394 (7th Cir.1998). In order to prevail on an ADEA claim, the plaintiff must establish that she would not have suffered an adverse employment action " 'but for' [her] employer's intentional age-based discrimination." *Debs,* 153 F.3d at 394 (citing *Konowitz v. Schnadig Corp.,* 965 F.2d 230, 232 (7th Cir.1992)). There are two ways a plaintiff may prove an age discrimination claim. "She may try to meet her burden head on by presenting direct or circumstantial evidence that age was the determining factor in her discharge. Or ... she may utilize the indirect, burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93

S.Ct. 1817, 36 L.Ed.2d 668 (1973)" which has since been applied to claims brought under the ADEA. *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 371 (7th Cir.1992) (quoting *Oxman v. WLS–TV,* 846 F.2d 448, 452 (7th Cir.1988)); see *Rabinovitz v. Pena,* 89 F.3d 482, 486 (7th Cir.1996) (applying the prima facie framework to an ADEA claim); see also *Debs,* 153 F.3d at 395; *Chiaramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391, 396 (7th Cir.1997). If the plaintiff pursues the direct method of proof, she must set forth evidence that can be interpreted by the trier of fact as an acknowledgment of the employer's discriminatory intent. *Chiaramonte,* 129 F.3d at 396. Accordingly, this evidence needs to relate to the motivation of the decision maker who made the contested decision. *Id.* (citing *Cheek v. Peabody Coal Co.,* 97 F.3d 200, 203 (7th Cir.1996)). Rudolph has not utilized the direct method and instead argues that she has established a genuine issue of material fact under the *McDonnell Douglas* burden shifting approach.

### 1. The Prima Facie Case

■ In order to establish a prima facie case of age discrimination under the ADEA, Rudolph must show (1) she was in the protected age group of forty or older; (2) she applied for and was qualified for the position sought; (3) she was rejected for the position; and (4) a person who was younger than the plaintiff was given the position. *Rabinovitz,* 89 F.3d at 486 (citing *Sample v. Aldi, Inc.,* 61 F.3d 544, 548 (7th Cir.1995)); *see also Senner v. Northcentral Technical College,* 113 F.3d 750, 755 (7th Cir.1997); *Hartley v. Wisconsin Bell, Inc.,* 124 F.3d 887, 892–93 (7th Cir.1997). Here, the parties dispute whether Rudolph has offered evidence that establishes the fourth prong.

In meeting the fourth prong, the plaintiff does not have to show that the employee who was awarded the position was outside of the protected class, but that employee must be substantially younger than the plaintiff. *Hartley,* 124 F.3d at 892–93. The Supreme Court in *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312–13, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), emphasized

that being replaced by an employee who is "substantially younger than the plaintiff is a far more reliable indicator of age discrimination than the fact that plaintiff was replaced by someone outside of the class." *Id.* at 313, 116 S.Ct. 1307. Even before the *O'Connor* decision, the Seventh Circuit required a plaintiff to demonstrate that the there was a sufficient disparity in ages between the replacement or selected employee and the plaintiff. *Hartley,* 124 F.3d at 892. Noting that the Supreme Court did not define how many years qualifies as a "substantial" or "significant" gap, the Seventh Circuit in *Hartley* suggested that a ten-year age difference between the plaintiff and the selected employee is presumptively substantial under *O'Connor. Id.* at 893. The court did emphasize, however, that "in cases where the disparity is less, the plaintiff still may present a triable claim if she directs the court to evidence that her employer considered her age to be significant." *Id.* Although the court in *Hartley* had already decided that the plaintiff had not successfully called the employer's legitimate nondiscriminatory reason into question, the court stated that the six and seven year difference between the plaintiff and the two employees chosen for the position was a presumptively insubstantial gap, and the plaintiff had no other evidence that the employer viewed her age as significant. *Id. See also Richter v. Hook–SupeRx, Inc.,* 142 F.3d 1024, 1029 (7th Cir.1998) (reiterating that a seven year age difference is a presumptively insubstantial gap).

Under the direction of *O'Connor* and *Hartley,* the Court must examine whether the employees who were chosen for the positions instead of Rudolph qualify as substantially younger. Five of the employees were substantially younger than Rudolph, and had they been the only ones chosen, they could easily meet the presumptively substantial ten year difference. However, both Sims, at age fifty-three and Petre, at age fifty-two, were less than ten years younger than Rudolph. At a respective six and seven years younger than Rudolph, both Sims and Petre are presumptively not substantially younger under the fourth prong of the prima facie case. *See Hartley,* 124 F.3d at 893.

Rudolph urges that the ages of those made supervisory operating accountants should be averaged to determine if substantially younger employees were given the position. The average age of those selected for the first vacancy was 44.5; when the employees who filled the second vacancy are included in the calculation, the average age of the chosen employees was 41.6. However, as Customs noted, there is no case law which supports such an approach to determining whether a plaintiff has met the fourth prong of the prima facie case. Although there were employees given the promotion who were substantially younger, some of the employees do not qualify as substantially younger, suggesting that younger employees were not necessarily treated more favorably than older employees. Thus, Rudolph may not be able to establish the fourth prong of her prima facie case.

■ However, the Court does not need to decide whether Rudolph has offered that extra evidence indicating age was a factor or whether Rudolph has in fact established a prima facie case. Generally, under the *McDonnell Douglas* analysis, once a plaintiff makes a prima facie case, the burden of production shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the employment action. *McDonnell–Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Chiaramonte,* 129 F.3d at 398 (as applied to ADEA). Yet, when the defendant offers a legitimate, nondiscriminatory reason for not promoting the plaintiff, the Court may go directly to the issue of whether the plaintiff has offered evidence sufficient enough to create a genuine issue of material fact concerning pretext without resolving a dispute as to a prong of the prima facie case. *Fairchild v. Forma Scientific, Inc.* 147 F.3d 567, 572 (7th Cir.1998). *See also EEOC v. Our Lady of the Resurrection Med. Ctr.,* 77 F.3d 145, 149–50 (7th Cir.1996). The defendant's reason need only be a nondiscriminatory reason for the conduct, "which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The given reason does not have to be a good justification for the conduct. *Timm v. Mead Corp.,* 32 F.3d 273, 275 (7th Cir.1994).

■ The defendant has presented a legitimate nondiscriminatory reason for not selecting Rudolph for one of the supervisory operating accounting positions. As explained by Customs, the new GS–14 positions were created in an effort to comply with the CFO Act, and accordingly, the defendant wanted to promote applicants who possessed superior accounting expertise and technical proficiency skills. Def.'s Br. in Supp. of Mot. for Summ. J. at 17. The interview panel determined that Rudolph did not demonstrate sufficient technical knowledge for the position. Accetturo Aff. at 2–3; Smith Aff. Those who interviewed Rudolph found her interview answers to be deficient. *Id.* Specifically, both Accetturo and Smith stated that Rudolph was not able to properly define an integrated accounting theory. *Id.* Furthermore, although she has worked in the general area of accounting, Rudolph has no bachelor or masters in accounting, has taken no accounting training since 1985 and is not a CPA. *See* Def.'s Ex. 2. Although she has experience supervising and managing accountants, the panel determined that she did not have the necessary accounting skills for the position. Accetturo Aff. at 2; Hamilton Aff.; Smith Aff. Of the other seven employees selected for the position, all seven have at least a bachelor's degree and five are CPAs. Def.'s Ex. 11. Customs' conclusion that Rudolph did not possess the requisite skills for the position, as mandated by the CFO Act, is a nondiscriminatory reason for its action.

### 2. Pretext

■ If the employer can articulate a nondiscriminatory reason, the *McDonnell Douglas* framework becomes irrelevant, and the plaintiff has the opportunity to demonstrate that the reason provided by the employer is pretext. *McDonnell–Douglas,* 411 U.S. at 804, 93 S.Ct. 1817; *Hicks,* 509 U.S. at 507, 113 S.Ct. 2742; *Chiaramonte,* 129 F.3d at 398. Pretext can be established by showing "either that a discriminatory reason more likely motivated the employer or that the employer's explanation is unworthy of credence." *Chiaramonte,* 129 F.3d at 398; *see also Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1039 (7th Cir.1993).

■ As long as the reason offered by the employer is an honest one, the fact that a company's employment practices are misguided or mistaken is not relevant to the Court's inquiry. *Johnston v. Amax Coal Co.,* 963 F.Supp. 758, 766 (S.D.Ind.1997). As the Seventh Circuit has explained, "an opportunity for rebuttal is not an invitation to criticize an employer's evaluation process or simply to question its conclusions about the quality of an employee's performance." *Kariotis v. Navistar Int'l Tranp. Corp.,* 131 F.3d 672, 677 (7th Cir.1997). If an employer honestly believes the reasons it offers for its decision, no matter how ill-informed, ill-considered, trivial or baseless the reasons may be, the explanation is not a pretext. *Id.* at 676–78 (citing *McCoy,* 957 F.2d at 373; *Pollard v. Rea Magnet Wire Co., Inc.,* 824 F.2d 557, 559 (7th Cir.) *cert. denied* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987)). The pertinent inquiry is not whether the employer's decision is right, but whether the reasons the employer gave for its decision are honest. *Id.* at 677 (citing *Gustovich v. AT & T Comms., Inc.,* 972 F.2d 845, 848 (7th Cir. 1992)). The Court must be cautious in examining the plaintiff's pretext argument, as " 'there is a fine line between evidence that appropriately challenges the employee's proffered reasons as being unworthy of credence and evidence that the employer has made a mistake or a bad business judgment.' " *Johnston,* 963 F.Supp. at 766 (quoting *Kralman v. Illinois Dept. of Veterans' Affairs,* 23 F.3d 150, 156 (7th Cir.1994)). It is not the Court's duty to sit as a "super-personnel department that reexamines an entity's business decisions." *Mechnig v. Sears, Roebuck, & Co.,* 864 F.2d 1359, 1365 (7th Cir.1988).

■ For a variety of reasons, Rudolph argues that Customs' explanation for not selecting her is a pretext for discrimination. She suggests that the inconsistency between her overall and accounting skills scores on the "Evaluation Board Rating Sheet" and the interviewers' claim that her interview answers did not demonstrate a sufficient accounting knowledge raises an inference of pretext. Furthermore, she maintains that Customs' attempt to characterize the six-year old CFO Act, that contains no specific accounting skill requirements, as compelling immediate and urgent changes suggests that the given reason was pretext. She characterizes Customs' reliance on the fact she did

not have a college degree nor was she a CPA as a mask for discrimination, as it has confused education with skill and experience. Though these concerns of Rudolph's may highlight that Customs' did not do a good job of formulating or expressing its criteria, the evidence upon which Rudolph relies does not give rise to an inference of pretext.

The evidence indicates that as the applicants proceeded to interview stage, the Evaluation Board's appraisal of Rudolph's written application, as measured by the established criteria, ranked Rudolph as the highest scoring applicant for the position. However, her high composite score and her "good" rating for accounting skills and knowledge, followed by a rejection, does not automatically create an inference of pretext or age discrimination. Rudolph suggests that the defendant's claimed interest in a strong accounting background as the most important skill required for the position is only a mask for age discrimination, but she offers no evidence to support that claim.

It is true that in the written criteria contained in the first vacancy notice, there was no emphasis on the importance of strong accounting skills, nor was there an emphasis on the need for a college degree or CPA standing.[5] However, the defendant does not have to make that emphasis clear at the written application process. As long as the defendant evaluated all the applicants using the same methods and criteria in a neutral manner, the applicants did not need to be aware of which criteria were given greater importance. *Allard v. Indiana Bell Tele. Co., Inc.,* 1 F.Supp.2d 898, 924 (S.D.Ind.1998) (examining a reduction in force situation). According to Accetturo, the same three individuals interviewed all eight applicants for the first vacancy. Accetturo Aff. at 1. Each applicant was asked the same questions in the same order. *Id.* The interview panel stated that Rudolph did not demonstrate a sufficient technical knowledge of accounting in her interview answers. Accetturo Aff at 2; Smith Aff. Smith explained that she was not able to adequately identify accounting theo-

ries, standards, concepts or applications. Smith Aff.

In essence, Rudolph's pretext argument seeks to discount the interview as a part of the application process. The argument suggests that regardless of the correctness of her interview answers, the high rating given her written application should have been enough to secure her the position. Accetturo and Smith explained that the selections for the supervisory operation accountant positions were based upon the written application and the answers to the interview questions. Accetturo Aff. at 3. Rudolph herself admitted in her deposition testimony that being at the top of a qualified list does not guarantee an applicant the right to be selected for the job. Rudolph Dep. at 164. She does not contest that her interview answers were improperly evaluated or that others who gave similar answers were treated more favorably. Presumably, when Rudolph's written application was evaluated for accounting knowledge, that assessment was made on the basis of her description of her accounting skills. Def.'s Ex. 9. There is no indication that the written application process required her to answer specific questions such as those asked by the interviewers. *See* Def.'s Exs. 2 & 8. Rudolph admits that she does not have a college degree, nor is she a CPA. *See* Rudolph Dep. at 211–13. Furthermore, she does not contest that those who were hired have, at the minimum, a college degree, and most are CPAs. *Id.* No evidence has been offered to the Court that allows for an inference that the emphasis placed on technical accounting skills was not applied equally to all candidates. Additionally, there is no evidence that college degrees and CPA standing were not emphasized in past or future hirings for the same position.

Rudolph clearly disagrees with the emphasis Customs placed on the need for technical knowledge and advanced education in filling the new positions. According to Rudolph, Customs virtually ignored the important managerial aspect of the job, for which she contends she was highly qualified.[6] Al-

---

**5.** As will be discussed, the second vacancy announcement provided more specific educational requirements.

**6.** At one point in her deposition testimony, Rudolph asserted that Goerl had written a letter in

response to Rudolph's inquiry stating that Goerl told the interviewers to get "the best management they could." Rudolph Dep. at 219. However, Rudolph has not produced that document.

though Rudolph may disagree with the emphasis place on technical knowledge and education, it does not automatically follow that either of those requirements were developed in order to discriminate or that Customs used those requirements to discriminate against her.

Customs points to correspondence from the GAO and Customs that highlights the need for improved technical proficiency. *See* Def.'s Ex 4 at 3–5; Def's Ex. 5 at 4. In a June 1994 letter to GAO, the Commissioner of Customs spoke of the plan to recruit candidate with "strong accounting backgrounds, many of who will be Certified Public Accountants" in order to improve the technical proficiency of the CFO staff in the Customs Division. Ex. 5 at 4. In her brief, Rudolph surmises that Customs confused education with experience and skill. Plf.'s Resp. to Mot. for Summ. J. at 16–17. Even if Customs mistakenly believed that education and CPA standing indicated that an applicant had the required skill and experience for the job, that decision does not in itself give rise to an inference of discrimination. According to Customs, the interviewing panel recommended the original five applicants and then the other two applicants because they believed they were best qualified for the new positions. The employer has the ability to make a decision as to whom it deems best qualified. Customs allowed the panel to makes its recommendations and Diaforli to accept or reject those recommendations. The decision of who is best qualified is a business decision which the Court is not going to second guess. *Mechnig*, 864 F.2d at 1365. Customs may have subjective preferences, such as giving greater weight to technical knowledge and college degrees, as long as it does not express forbidden preferences. *Senner*, 113 F.3d at 756. *See also Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1458 (10th Cir.1994). There is no evidence from which a jury could infer a "sinister motive"

for giving preference to college educated and CPA certified applicants. *See Senner* 113 F.3d at 756.

Customs may have done a poor job of making clear in the vacancy notice just how important the technical skills and education requirements were for the new positions. The Court notes that in the second vacancy notice, Customs listed under the "qualification requirements" section that the applicants needed a college degree in accounting or related business field or a combination of a certain number of accounting courses plus experience.[7] This added some clarification to the requirements as compared to the previous vacancy notice.[8] However, the fact that one criteria carried greater weight than the others and that the interview panel determined that those who have college degrees and are CPAs were better qualified does not give rise to an inference of discrimination. Evidence that the employer did not conduct the application process as well as it could have or that it did not make the best selection decisions it could have even under its own criteria is not an indication of discriminatory intent. *See O'Connor v. DePaul Univ.*, 123 F.3d 665, 670 (7th Cir.1997) (holding that whether DePaul violated its own personnel guidelines when it fired the plaintiff is not determinative of pretext, as the Court must look only at whether the DePaul's given reason did underlie the plaintiff's termination). Rudolph's high evaluation score and non-selection, without supporting evidence, does not establish pretext or allow for an inference of discrimination. Even when Rudolph's high score is considered in conjunction with her concerns as to how the CFO Act was relied upon for Customs' nondiscriminatory reasoning, Rudolph's pretext argument still falls short of producing the needed evidence.

The fact that the CFO Act itself does not specifically require skills that eliminate Ru-

---

7. Rudolph has not offered evidence as to whether she was qualified under these new requirements when she applied for the final two positions of the second vacancy opening. Therefore, any pretext argument concerning the selection for the second vacancy positions is weaker than her argument regarding the initial promotions.

8. As the Court has previously mentioned, the first vacancy qualification requirements stated that the applicant needed to meet the amount of general and/or specialized experience required by the published Office of Personnel Management (OPM) qualification standards. Def.'s Ex. 6. This information was not provided to the Court, and therefore, the Court is not aware of what those requirements included.

dolph from consideration does not support an inference of discrimination. Such legislation may not provide the specifics of implementation and may leave that job to the administering agencies. Furthermore, Customs' implementation and application of the Act do not give rise to any discriminatory inference. Though it had been years since the Act was passed, Rudolph has not come forward with any evidence that Customs had previously implemented similar positions under the Act using different application or interview criteria. The fact that Customs was slow to act does not suggest pretext. Moreover, Rudolph's argument that Customs was not actually following a legislative mandate because it was hiring from within the agency instead of hiring "additional" staff, as it had told the GAO, does not speak to the issue of possible discrimination. As to the complaint that Customs never mentioned the legislative mandate of the CFO Act during the application process, there is no evidence to support a belief that such disclosure was required.

As the Seventh Circuit has noted, there is a difference between evidence that allows for a reasonable inference and evidence that allows for speculation. *Senner,* 113 F.3d at 758. In order to rebut the defendant's nondiscriminatory reason, Rudolph needs to offer evidence that allows for a reasonable inference of discrimination. Rudolph has failed to offer that type of evidence here.[9] None of these complaints regarding what the defendant told Rudolph about the Act or how and when the Act was implemented show that either a discriminatory reason more likely motivated the defendant's decision to

not hire Rudolph or that the explanation that Rudolph was not as qualified as the other candidates is unworthy of credence. *See Chiaramonte,* 129 F.3d at 398. Thus, these concerns, even when taken together with the Rudolph's high score on the Board Evaluation Sheet do not allow for an inference of pretext.

## III. CONCLUSION

Although it is questionable whether Rudolph could in fact establish her prima facie case, because the defendant presented a legitimate nondiscriminatory reason for its decision to not award Rudolph a supervisory operating accountant position, the Court was able to proceed to the pretext argument. Rudolph has not presented enough evidence to create a genuine issue of material fact. Therefore, the defendant's motion for summary judgment should be and hereby is **GRANTED.** No triable issues remain for a jury trial and the defendant is granted judgment as a matter of law.

9. The Court notes that in her deposition testimony Rudolph spoke of comments made to her "throughout the years" that she interpreted as displaying age animus. Rudolph Dep. at 172–74, 188. Rudolph stated that she could not quote the comments and had no recollection as to when the remarks were made. *Id.* at 177. She only recalled that either Accetturo or Hamilton made some comment in front of her that he was "going to get out of here by the time I'm 55. Anybody that stays after 55 has got to have a problem with them ... There's better things to do than this." *Id.* at 174. The other comment she recalled is that someone told her it looked like she had let out her belt. *Id.* at 188. Customs correctly concluded that such statements were not sufficient to offer as a basis for proving

discrimination under the direct method. Rudolph did not try to do so. However, the Court also notes that Rudolph did not address these comments in her Response brief. Given the lack of information regarding who made the comments and when those comments were made, such circumstantial evidence would not support a finding of pretext either standing alone or in conjunction with Rudolph's other offered evidence. *See O'Connor,* 123 F.3d at 671–72 (explaining that although stray remarks made by a decisionmaker that are not relative to the employment decision may be relevant to the pretext question, the remarks must be considered in context of all the evidence because standing alone, they cannot support an inference of discrimination.)