**Patricia FARROW, Plaintiff,**

v.

**HUMANA HEALTH PLAN, INC., Defendant.**

No. 98 C 4531.

United States District Court, N.D. Illinois, Eastern Division.

Nov. 8, 1999.

See also 1999 WL 558132.

Uche O. Asonye of Asonye & Associates, for plaintiff Patricia Farrow.

Michael G. Cleveland and Thomas W. Snyder of Vedder, Price, Kaufman & Kammholz, for defendant Humana Health Plan, Inc.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Patricia Farrow ("Farrow") has charged her former employer Humana Health Plan, Inc. ("Humana") with race-based employment discrimination (she is African–American) as well as with retaliation in violation of Title VII of the Civil Rights Act of 1964 as amended ("Title VII," 42 U.S.C. §§ 2000e to 2000e–17 [1]) and 42 U.S.C. § 1981 ("Section 1981") [2]. Although this Court had earlier cautioned Humana that such a procedure would seem ill-advised (see the Appendix to this opinion), Humana has now filed a Fed. R.Civ.P. ("Rule") 56 summary judgment motion. Both sides then complied with this District Court's LR 56.1, [3] and the motion is fully briefed and ready for decision. For the reasons stated in this memorandum opinion and order, Humana's motion is denied.

### Summary Judgment Standards

Familiar Rule 56 principles impose on Humana the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must

---

1. All Title VII citations will take the form "Section—," referring to the Title 42 numbering rather than to Title VII's internal section numbering.

2. Disparate treatment claims such as Farrow's are subject to the same burdens of proof and production under Title VII and Section 1981 (*Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1472 (7th Cir. 1993)). This opinion therefore engages in a single analysis that applies equally to the Title VII and Section 1981 claims.

3. LR 56.1(a) and (b) are designed to facilitate the resolution of Rule 56 motions by calling for evidentiary statements and responses to such statements (in each instance with record citations), highlighting the existence or nonexistence of factual disputes. This opinion cites to Humana's LR 56.1(a) statement as "H. 56.1(a) ¶—." Farrow's LR 56.1(b) response and statement of supplemental facts are respectively cited as "F. 56.1(b) ¶—" and "F. 56.1(b) Supp. ¶—." Where both parties' LR 56.1 statements support a stated fact, this opinion simply uses "56.1 ¶—."

"read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n. 2 (7th Cir.1997)). "[T]his general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broad. Co.*, 957 F.2d 368, 370–71 (7th Cir.1992)). Summary judgment is appropriate only if the record reveals that no reasonable jury could conclude that Farrow was treated in a statutorily prohibited discriminatory fashion (see *Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1402 (7th Cir.1996) and cases cited there).

As with every summary judgment motion, this Court accepts nonmovant Farrow's version of any disputed facts. What follows in the *Facts* section (and to some extent later) is culled from the parties' submissions, with any differences between them resolved in Farrow's favor.

*Facts*

Farrow has been a registered nurse for over 25 years.[4] She began working for Humana in the summer of 1994, initially in its nursing registry and then (in August 1994) as a Clinical Education Coordinator (later renamed Chronic Care Education Coordinator[5]) in Humana's Nursing and Allied Health Department ("Department") located at Humana's Sykes Health Center in Chicago, where Farrow maintained an office (56.1 ¶¶ 1–2, 6; F. 56.1(b) Supp. ¶ 11).

Farrow's duties as Education Coordinator included developing, coordinating and teaching various evening classes relating to self-treatment of chronic conditions such as asthma, diabetes and high blood pressure. Those classes were generally conducted either by Farrow or an instructor

hired and trained by Farrow three days each week from 6 p.m. to 8 p.m. at three different Humana Health Centers: Sykes, Beverly and Evanston (Farrow Dep. 42; 56.1 ¶¶ 7–8). Farrow performed her duties in a satisfactory manner until April 1997, when Humana terminated her (F.56.1(b) Supp. ¶¶ 14–17, 277).

During Farrow's employment with Humana, Department's Executive Director was Mary Patricia White ("White"), who is Caucasian[6] (56.1 ¶ 4). White was responsible for hiring and firing as well as for day-to-day management of Department, including the supervision of Department supervisors (F.56.1(b) Supp. ¶ 6).

Immediately under White in Department's management hierarchy was Sally Hillyer ("Hillyer"), also Caucasian. Hillyer had held Department's Director of Nursing ("Director") position since 1993 and was Farrow's immediate supervisor when Farrow began working at Humana in 1994. Hillyer occupied the Director position until the end of October 1996, when she resigned that position for reasons unrelated to this case. Hillyer still continued to play an active role in Department and participated in Farrow's termination in April 1997 (56.1 ¶ 21).

Sheila Phelan ("Phelan"), also Caucasian, was the second person holding an Education Coordinator position in Department. Phelan had responsibility for developing, coordinating and teaching classes in the maternal health field, while as stated earlier Farrow had like duties in the chronic medical conditions field (56.1 ¶ 10). Because Phelan and Farrow were exempt employees who taught classes at other Humana facilities in the evenings (thus requiring flexible travel time), their schedules were "flexible"—that is, to accommodate their coordination and teaching duties

---

**4.** Farrow received her nursing certificate in 1969 and then her Bachelor of Science in Nursing in 1973 (Farrow Dep. 6).

**5.** Although the name of the position changed—as was true of many other positions in the Department—Farrow's job description

and salary did not (Farrow Dep. 44–45). For the sake of simplicity this opinion will refer to Farrow's job position or title as "Education Coordinator."

**6.** This ("White is Caucasian") is relevant evidence, not mere tautology.

their respective hours had to and did fluctuate, based largely on their own discretion and the overall requirement to put in 8 hours per day[7] (F.56.1(b) Supp. ¶¶ 137–38).

*Farrow's Internal Complaints of Discrimination*

In May 1995 and again in June 1996, Farrow met with White and complained that she was being treated in a racially discriminatory manner by Hillyer (56.1 ¶ 9). Farrow reported to White at least these 10 examples of assertedly disparate treatment by Hillyer:

1. Farrow's time cards were scrutinized more closely than Phelan's (F.56.1(b) Supp. ¶¶ 55–57, 61, 88–90).

2. Hillyer would call Farrow (but not Phelan) at home when Farrow was either sick or on vacation (Farrow Dep. 54–58).

3. Hillyer would "check up" on Farrow (but not Phelan) when Farrow was teaching at other Humana centers (F.56.1(b) Supp. ¶ 103).

4. Farrow (but not Phelan) was cited by Hillyer for an apparent dress code violation (wearing denim), while Phelan violated the dress code with impunity (F.56.1(b) Supp. ¶¶ 32–35, 38–54).

5. Another black employee in the Department, Liz Cross, was forced to make up time missed for emergency care of her child, while Phelan was not similarly required to make up time missed for "emergency" care of her dog (which had been spayed) (F.56.1(b) Supp. ¶¶ 69–72, 91).

6. Hillyer would describe persons that came to meet Farrow (for business reasons) while Farrow was away as Farrow's "friends" only when the visitor turned out to be black (Farrow Dep. 77–80).

7. Hillyer took sole credit for work done in conjunction with Farrow (F.56.1(b) Supp. ¶¶ 36–37).

8. Farrow (but not Phelan) was required to come in on payday Fridays to get paid, whether or not she was scheduled to be on vacation or otherwise off (F.56.1(b) Supp. ¶ 58).

9. Phelan was allowed (and even encouraged) to start a personal business using at least some Humana time and resources, while similar conduct by Farrow would not have been tolerated (F.56.1(b) Supp. ¶¶ 73–84).

10. On several days per year when she was scheduled to work, Phelan would be allowed to come to work for a couple of hours solely to decorate the office for a particular holiday and then to leave without doing any "real" work, while similar conduct by Farrow would not have been tolerated (Farrow Dep. 101–02).

Farrow later complained that her performance evaluations and raises in salary were substantially "delayed," while White and Hillyer processed Phelan's evaluations and raises promptly (F.56.1(b) Supp. ¶¶ 62–63, 92–97, 99–102). Finally, Farrow observed that Phelan routinely arrived at work hours late or left hours early, while White and Kaneski disciplined (and ultimately terminated) Farrow for similar conduct (F.56.1(b) Supp. ¶¶ 59–60).

Hillyer was not singled out for individual reprimand, counseling or sensitivity training as a result of Farrow's complaints, nor did White report Farrow's complaints to Humana's Human Resource Department ("HR"), both as required by Humana policy (56.1 ¶¶ 16–17; F. 56.1(b) Supp. ¶¶ 106–14, 119–21, 135–36).

*Farrow's Director-of-Nursing Candidacy*

In July 1996, after Hillyer had resigned (giving three months' notice) and one month after Farrow's most recent internal discrimination complaint, Farrow applied for the open Director position (56.1 ¶¶ 16–17; F. 56.1(b) Supp. ¶ 141). Farrow's dis-

---

**7.** Representative of the record evidence regarding the flexible nature of the hours worked by the Education Coordinators, Hillyer testified that "[i]t was really on a trust factor that they would put in 40 hours by the end of the week" (Hillyer Dep. 111).

ciplinary record had been "clean" before she applied for that promotion (F.56.1(b) Supp. ¶¶ 18–19, 170). Hence if Farrow were qualified for the position, she was eligible to submit an internal transfer request to apply for the position (F.56.1(b) Supp. ¶¶ 143–144, 158, 171–177). No one disputes that Farrow would have been qualified for the position had a master's degree been "preferred" rather than "required." Farrow holds a bachelor's but not a master's degree (F.56.1(b) Supp. ¶ 156).

Because there is conflicting evidence on the issue whether a master's degree was or was not required, this paragraph sets out the evidence in a light most favorable to Farrow. First, both Hillyer (who held the Director position before Farrow applied) and Terry Kaneski ("Kaneski") (who held the equivalent of the Director position after Farrow was rejected) did not have master's degrees (F.56.1(b) Supp. ¶¶ 207–08). Second, Farrow applied for the position after seeing a job posting that said a master's degree was not required. Third, on Farrow's telephonic inquiry the Humana Personnel Department had informed her that only a bachelor's degree was required. Fourth, HR initially placed a *Chicago Tribune* ad stating that a master's degree was preferred, not required. Finally, HR sent Farrow a fax requesting her to schedule an interview "ASAP"—at least implying that Farrow was a suitable candidate (F.56.1(b)¶¶ 34–35; F. 56.1(b) Supp. ¶¶ 142–43, 146–48, 150, 151–53). Despite all that, before Farrow could set up an interview for the Director position HR called her and told her that she was not qualified for the position because White had informed HR that a master's degree was (now) required (F.56.1(b) Supp. ¶¶ 150–52).

After White thus denied Farrow the opportunity to apply for the Director position on the asserted basis that she was not qualified for the job, White "withdrew" the opening (F.56.1(b) Supp. ¶¶ 202–05). What is meant by "withdraw" is unclear. White claims that her supervisor, Dr. Ernest Weis, who did not know of either Farrow's race, prior discrimination complaints or promotion efforts, instructed her to remove the posting for the Director position because he was considering eliminating the entire Department (H.56.1(b) ¶¶ 36–42). But White had the ultimate discretion in deciding whether or not to "withdraw"—in fact rather than in name only—the position. Someone was indeed hired to carry out the duties of the Director position, but White changed the name of the position to "Acting Director."

In November 1996 White hired Kaneski, a Caucasian woman who does not hold a master's degree, to fill the equivalent of the Director position recently vacated by Hillyer and denied to Farrow (H.56.1(a) ¶¶ 44–50). Kaneski was hired as Acting Director of Nursing. Hillyer testified that the roles of Director and Acting Director were "essentially the same" (F.56.1(b) ¶¶ 44–50 & Supp. ¶¶ 210–17).

*Farrow's Progressive Discipline and Ultimate Termination*

Humana's tardiness policy (and its procedures for dealing with those who violate it), as administered by Department and applied to Education Coordinators, is not a model of clarity (F.56.1(b) Supp. ¶¶ 276, 287, 399, 304–06, 314–38). Farrow and Phelan were "loosely" required to submit weekly planners, estimating generally when they would be at work and when they would be teaching classes for a particular week (56.1 ¶¶ 53–54). Until late November 1996 no concrete policy existed as to arrival or departure times for the Education Coordinators, much less any requirements that such times had to be (1) estimated on their weekly planners, (2) submitted at a certain time and (3) thereafter religiously adhered to.

As managed by Hillyer, Department functioned on a tacit understanding that Farrow and Phelan would work approximately 40 total hours per week, but other than that very sketchy guideline the Education Coordinators in fact worked whenever and for however long it took to get the job done (F.56.1(b) Supp. ¶¶ 288–300,

304–12). Until late 1996 the weekly planners functioned for the primary benefit of the secretaries, who used them in order to inform callers that Farrow or Phelan would likely be in late if a class was scheduled that day or to relay that one or the other could be located at a particular Center where a class was then being conducted. In reality Farrow and Phelan came and went at their own discretion, with their day-by-day hours fluctuating wildly.

On July 22, 1996 Hillyer circulated a memo requesting that nurses provide greater detail by estimating arrival and departure times on their planners. Although Humana claims that Hillyer also began to require nurses to be at work by 9:30 a.m. unless a class was scheduled for that evening, that alleged requirement (if indeed it existed) was not enforced under Hillyer's supervision (F.56.1(b) Supp. ¶¶ 288–300, 304–12).

Shortly after Kaneski took over the Acting Director position, she issued a November 26, 1996 memo requiring weekly planners to be completed in more detail and submitted to her by the Thursday preceding the week to which the planner applied. Kaneski also required nurses to call her at home before 7 a.m. on Tuesdays, Wednesdays and Thursdays (the days that she worked) if one became ill and thus had to stay home (H.56.1(a) ¶ 58–63).

Besides those Department rules instituted by Kaneski, in December 1996 Humana promulgated a new "progressive discipline policy" pursuant to which an allegedly recalcitrant (management) employee could be led progressively down a five-step path to termination (H.56.1(a) ¶ 64; F. 56.1(b) Supp. ¶ 331). It is unclear, however, whether that policy should have been applied to Farrow. By its express terms it covered only offenses listed in the manag-ers' manual, which did not apply to regular non-management employees such as Farrow (F.56.1(b) ¶ 64 & Supp. ¶¶ 325–37).[8] In any event, if the policy is in fact applicable, it is brought into play by a management employee's "initiating" the offending employee into the process (F.56.1(b) Supp. ¶¶ 321–24). Here Kaneski and White did initiate Farrow into the progressive disciplinary process relating to tardiness[9] in the month of its adoption (December 1996).

Step one for tardiness—"documented coaching"—occurred on December 19, 1996 for three instances of alleged tardiness on December 10, 12 and 17. But Farrow denies that she was tardy at all. As for the first two instances, Farrow testified that she arrived to work at Sykes at the time indicated on her planner and that she had simply been in another part of the Sykes building in the morning for work-related reasons (Farrow Dep. 162). As for the third instance, Farrow testified that she was not required to be at work until around noon because she had a class to teach that night (id. 166).

Step two for tardiness—"verbal counseling"—occurred on February 12, 1997 for two instances of alleged tardiness on January 30 and February 4. Again Farrow denies that she was tardy on either occasion.

Step three for tardiness—"written counseling"—occurred March 4, 1997 for two instances of alleged tardiness on February 24 and 27. Those instances are also denied by Farrow.

Step four for tardiness—"final warning"—took place on April 2, 1997 for Farrow's alleged tardiness that day. In that instance Farrow admittedly came in later than stated in her weekly planner, but she explains that happened because she was

---

**8.** To say that the method used for disciplining an infraction was in error is not of course to say that no infraction occurred. Nor does Humana's possible violation of its own policy equate to a violation of Farrow's federally protected rights—though of course Humana's noncompliance might evidence a statutorily prohibited intent on its part.

**9.** It will be recalled that Humana terminated Farrow for alleged tardiness, not for any alleged absenteeism. That being the case, any events and Humana policies dealing with absenteeism are irrelevant and will be ignored.

working late the previous night calling class attendees.

On April 14, 1997 (a Monday) Kaneski went on vacation. White had asked Hillyer to fill in for Kaneski as Director while Kaneski was away (H.56.1(a) ¶ 100). Kaneski told Hillyer of Farrow's final warning status and instructed her to watch Farrow closely with respect to tardiness (F.56.1(b) ¶ 103) Meanwhile Farrow had prepared but not submitted a weekly planner because Kaneski would not be there and Hillyer did not have a mailbox. On April 14 Farrow had planned to work from 12:30 p.m. to 8:30 p.m. because she had a late class to teach that night (F.56.1(b) ¶ 104). When Farrow did not arrive promptly at 9 a.m., Hillyer reported her "tardiness" to White. White called HR to ensure that she had followed all of the appropriate steps in the progressive disciplinary process (H.56.1(a) ¶ 108), then instructed Hillyer to terminate Farrow (*id.*). Farrow was terminated without having been given an opportunity to contest or explain the circumstances (F.56.1(b) ¶ 110 & Supp. ¶ 353–54).

*Farrow's EEOC Charges*

In January 1997 Farrow retained an attorney in connection with her presently-advanced discrimination claims (save that relating to Farrow's termination, which had not yet occurred). Farrow informed White and Kaneski of that fact in February 1997 during one of her frequent counseling sessions with Kaneski, sessions that were becoming weekly events (F.56.1(b) ¶ 112 & Supp. ¶ 351).

Next Farrow filed racial discrimination and retaliation charges with EEOC on April 4, 1997, just ten days before her ultimate April 14 termination (56.1 ¶ 111). Even though EEOC had sent Humana a letter dated April 7, 1997 informing it of the charges filed by Farrow, Humana's "received" stamp on that notification letter bears an April 24 date (56.1 ¶ 113–14).

On or about April 24 Farrow filed another charge of race discrimination and retaliation to reflect the events that had occurred after the filing of her initial charges. After EEOC issued Farrow right-to-sue letters as to both charges, she timely filed this action.

*Count I: Race Discrimination*

Among the most commonly advanced claims of race discrimination are those charging disparate treatment in promotion and in discipline. Farrow alleges that Humana committed both of those sins in failing to promote her to Department Director and in disciplining (and ultimately terminating) her in situations in which a similarly situated Caucasian employee, Phelan, would not have been. This opinion addresses those claims in turn.

*Failure To Promote*

Under the seminal decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a prima facie case of racial discrimination in employment requires a showing,[10] through direct or circumstantial evidence or both, (1) that she belongs to a racial minority, (2) that she applied for and was qualified for the job, (3) that despite her qualifications she was rejected and (4) that after her rejection the position remained open and the employer continued to seek applications from persons with the plaintiff's qualifications, or that the position was filled by a non-minority person. Though the first and third of those elements are indisputably established, Humana contends that the nonexistence of evidentiary support for the second and fourth ele-

10. At this stage, of course, Farrow need not "show" or "establish" or "prove" anything, and she is not saddled with any preponderance of the evidence burden. Instead she faces the substantially less demanding Rule 56 task of demonstrating the existence of a genuine issue of material fact to stave off summary judgment. Although this opinion will frequently use the more demanding language, both to avoid the cumbersome repetition of that lengthier and more awkward locution and to be faithful in quoting the controlling case law, of course this Court consistently adheres to and applies the lesser Rule 56 burden.

ments entitles it to summary judgment. As to the second element, Humana says that Farrow was not qualified for the Director position because she did not have a master's degree. And as for the fourth element, Humana asserts that the position did not remain open (to Caucasian applicants) because the position was "withdrawn" and then not reinstated until after Farrow's termination.

■ In terms of Farrow's qualifications, even though she does lack a master's degree, a genuine issue of fact exists as to whether such a degree was really required. For one thing, Farrow testified to having seen a job posting that did not call for a master's degree. And significantly, neither Hillyer (who had held the position since 1993) nor Kaneski (who was hired for the Acting Director position after Farrow was denied the opportunity to apply) possessed a master's degree.[11] In view of such evidence (with the required reasonable inferences in Farrow's favor) to the effect that a master's degree was merely preferred and not required, Farrow will not be denied her day in court by reason of Humana's contradictory assertion that a master's degree was in fact a prerequisite for the position.

■ There is also a factual issue as to whether the Director position remained open, and whether a Caucasian applicant (who similarly did not possess a master's degree) was chosen to fill that opening, after Farrow's application was rejected. It could reasonably be decided by a jury that the position was never vacant: After all, HR continued to accept applications for the position, and then after Hillyer resigned Kaneski was hired as Acting Director beginning in November 1996. Hillyer, who had occupied both the Director and Acting Director positions, testified that the positions were substantially similar. In addition, Humana has brought forth no documentary evidence that White was indeed putting the position on hold while she was documenting the further need for the position, as assertedly requested by Dr. Weis. In short, a reasonable jury could conclude that the position was the same, that it was open, and that it was filled by a white applicant whose qualifications to do the job were equal to or less than Farrow's.

Humana raises those same contentions—that Farrow was not qualified and that the position was withdrawn—in an effort to show a race-neutral basis for its failure to promote Farrow. But given the catalogue of disparate treatment (as compared with Phelan) described by Farrow, again coupled with what the jury could view as the timing and circumstances of the abrupt change in the qualifications for the position and the sudden "withdrawal" of that position, that same reasonable jury could conclude that Humana's stated reasons for not promoting Farrow were pretextual. As such, this court denies Humana's motion for summary judgment as to Farrow's racial discrimination claim based on its failure to promote her to the Director position.

*Termination*

Farrow also claims that Humana discriminated against her by terminating her on account of her race. Section 2000e–2(a)(1) makes it unlawful for an employer:

> to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

To prevail on her claim Farrow "must show that the basis for her termination was the impermissible consideration of

---

**11.** It does not change the analysis that Regina Philips, an African American woman with a master's degree, was hired as Director after Farrow's termination and after Farrow had brought these claims. For one thing, a factfinder could reasonably view that as a belated effort to provide a cover story after Humana's discriminatory conduct had already been exposed to scrutiny. And from another perspective, a factfinder might rationally consider that hiring as indicating that Humana required black applicants but not white applicants to have master's degrees.

race, i.e., that a person of another race would not have been discharged under similar circumstances" (*Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 442 (7th Cir.1997) (internal quotation marks omitted)). *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1031 (7th Cir. 1998) describes the alternative routes to that destination:

> A Title VII plaintiff can satisfy her burden of proof by two avenues: (1) she may present direct evidence of discriminatory intent or, because of the difficulty in directly proving discrimination, (2) she may use the indirect, burden-shifting procedure set forth in *McDonnell Douglas*....

Because Farrow has adduced no direct evidence of Humana's discriminatory intent, she—like most discrimination plaintiffs—must follow the well-traveled *McDonnell Douglas* evidentiary path if her claim is to survive.

■ On that route Farrow must first establish a prima facie case of racial discrimination by showing that (1) she is a member of a protected class, (2) her job performance met Humana's legitimate expectations, (3) she suffered an adverse employment decision and (4) Humana treated similarly situated employees outside of the protected class more favorably (*Richter v. Hook–SupeRx, Inc.*, 142 F.3d 1024, 1028 (7th Cir.1998)). If Farrow satisfies that threshold inquiry, the burden of production (but not persuasion) shifts to Humana to articulate "a legitimate, nondiscriminatory reason for [her] termination" (id.). Finally, if Humana proffers such an explanation, Farrow must show that Humana's stated reason for its action was a mere pretext for the prohibited discrimination (id.)—that is, that race more likely than not motivated Humana's decision.

■ As before, Humana contends that no genuine factual issue exists as to the second and fourth elements. It first argues that Farrow's job performance did not meet Humana's legitimate expectations in that Farrow violated Humana's tardiness policy. But as to Education Coordinators Farrow and Phelan, it is hard to say that a formal "tardiness" policy even existed, and much harder to say that Farrow violated such a policy to the extent that justified her termination. Instead the only "policy" that existed as to arrival and departure times consisted of arbitrary rules imposed by Kaneski (apparently for her own convenience) beginning in late November 1996—and Farrow denies that she violated even those makeshift rules. Given the nature and history of the Education Coordinator positions as testified to by both Farrow and Phelan, a jury could reasonably conclude that Farrow was never in fact "tardy," much less tardy to the extent justifying termination.[12]

■ Humana also urges that no factual issue exists as to its equal treatment of similarly-situated employees. With Phelan being the only other Department employee who taught classes at other Humana facilities in evenings and who held the Education Coordinator position, she can be characterized vis-a-vis Farrow as the only truly similarly-situated Department employee. Phelan, a Caucasian, testified that she basically came and went as she pleased and was disciplined for "tardiness" on only one occasion. Phelan testified that in that instance she felt the discipline was in error due to the flexible hours that she (and Farrow) had always been permitted to keep. Tellingly, Phelan felt that she was being disciplined on that token occasion because Humana wanted to alleviate the appearance of "preferential treatment" as between her and Farrow.[13] Surely a rea-

---

**12.** As mentioned earlier, it is unclear to what extent an employee would have to be "tardy" in order to support her termination.

**13.** Phelan wrote on her progressive discipline form (H.App. II, Tab G (Hillyer Dep.) Ex. 9):

> I thought that as an exempt employee, there was some flexibility in my schedule. (There was when I began my employment in 7/94.) In light of the fact that my overall work performance is not in question, I can only assume that my schedule is being scrutinized due to issues with another employee.

sonable factfinder could decide that Humana's covering up the *fact* of preferential treatment was closer to the mark.

In response to Farrow's thus-satisfied task, Humana has produced a facially legitimate, nondiscriminatory business reason for terminating Farrow: her violation of Humana's tardiness policy. And so the *McDonnell Douglas* formulation requires Farrow to show that Humana's stated explanation is a pretext—"a lie, specifically a phony reason for some action" (*Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 348 (7th Cir.1997), quoting *Russell v. Acme-Evans Co.,* 51 F.3d 64, 68 (7th Cir.1995)). Farrow must "lose if the company honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless" (*Hartley v. Wisconsin Bell, Inc.,* 124 F.3d 887, 890 (7th Cir.1997)).

Once more a factual issue exists as to whether Humana genuinely believed that Farrow's alleged tardiness—rather than her race—justified the discipline and termination to which she was subjected. Phelan's timeliness track record was at least as variable as (and apparently more variable than) Farrow's.[14] Yet Phelan received a single slap on the wrist, while Farrow was dragged down the disciplinary path to termination in short order.[15]

In the end this Court cannot view it as undisputed that tardiness was the real basis for Farrow's discipline and termination, unaffected by the impermissible consideration of race. Certainly a jury could rationally conclude that Phelan would not have been discharged under similar circumstances. So Humana's motion for summary judgment as to Farrow's racial discrimination claim based on her termination must also be denied.

### Count II—Retaliation

Employers are prohibited by Section 2000e–3(a) from retaliating against any employee or applicant because she has opposed any discrimination prohibited by Title VII or because she has made a charge, testified, assisted or participated in an investigation, proceeding or hearing under Title VII. For that purpose a prima facie case is established by showing that (1) plaintiff took part in statutorily protected expression, (2) plaintiff suffered an adverse employment action and (3) a causal link exists between the protected activity and the adverse action (*Alexander v. Gerhardt Enters., Inc.,* 40 F.3d 187, 195 (7th Cir.1994) and cases cited there).

Again Farrow invokes the two adverse employment decisions, failure to promote and ultimate termination, in support of her claim. At this point she contends those decisions were the product of statutorily forbidden retaliation. Those adverse decisions will be addressed in turn.

### Failure To Promote

Farrow engaged in Title VII protected expression when she went to White and complained that she was being discriminated against by Hillyer in May 1995 and June 1996. Farrow then suffered an adverse employment action when she was denied the opportunity to interview for the Director position.

It could reasonably be found that White made a sudden decision to require a master's degree for the position, as well as a decision to "withdraw" the Director position in favor of an Acting Director position that bore an uncanny resemblance to the original position. And those decisions were made on the heels of Farrow's latest

---

14. Farrow testified that she worked at least 8 hours every day that she worked, while she observed Phelan coming and going at hours that were in stark contrast to those reported in Phelan's planners. Phelan admitted than she sometimes worked only a few hours a day, and those hours were unpredictable at best. Unlike Farrow, Phelan often failed to post a weekly planner at all.

15. As explained in the *Facts* section, Humana terminated Farrow—for nine so-called tardies—less than four months after initiating her into the freshly minted disciplinary policy that seemingly did not apply to Farrow at all.

race discrimination complaints to White in June 1996. In that light a jury could rationally conclude that Farrow's complaints about being treated differently because of her race played a causal role in her inability to gain the Director position. Hence Humana's summary judgment motion is denied as to that claim as well.

*Termination*

Finally, Farrow brings a claim of improper retaliation by Humana in response to her filing of an internal race discrimination complaint followed by formal EEOC charges. In that regard Section 2000e–3(a) provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Like many other cases, this one illustrates the practical difficulties in separating out the various components of employment discrimination analysis. For example, any examination of Farrow's prima facie attempt to establish her own satisfactory job performance necessarily overlaps the analysis of whether Humana's stated explanation for disciplining Farrow (based on her unsatisfactory job performance) was pretextual. In the same way, the inquiry into the fourth prima facie element (the allegedly less favorable treatment accorded to Farrow) meshes with Farrow's attempt to demonstrate pretext by identifying a similarly-situated but better-treated non-black.

But there is no need to get caught up in such conceptual concerns. After all, *McDonnell Douglas* is not intended to prescribe an ironclad formula. It rather furnishes a useful device to assist in getting to the bottom of the matter—as *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 521 (7th Cir.1994) put it:

Sometimes, however, too rigid adherence to the formulaic prescriptions of the appellate courts (which are laid out with particular factual settings in mind and are seldom as generalizable as purported) blocks proper analysis of what should be uncomplicated issues of discrimination.

As has been done in such cases as *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1391 (7th Cir.1990), this opinion will focus instead on the proposition that Farrow survives the present motion if she creates a genuine factual issue as to whether Humana's stated reason (tardiness) for disciplining and terminating her was pretextual.

Again it is not contested that Farrow engaged in statutorily protected expression when she filed her EEOC complaint on April 4, 1997. Humana contends that no material evidence contradicts its assertedly nonretaliatory intent when it terminated Farrow, because it had not yet received formal notification of the pending charges. But although Humana claims that it did not receive the EEOC notification letter until April 24, 1997, after Farrow had been terminated (a claim the jury is free to reject in light of the letter's April 7 date), Farrow points to her own actions in personally notifying Humana of her plans.

Farrow testified that she had informed Humana, via both White and Kaneski, of her anticipated action by telling them in February 1997 that she had hired an attorney the preceding month to represent her regarding Humana's ongoing discriminatory conduct. After Farrow filed her EEOC charges on April 4, 1997, EEOC sent its April 7 letter to Humana similarly apprising it of the pending action. As stated earlier, Farrow was abruptly terminated on April 14 without being given an opportunity to explain her conduct or to express her considered opinion that she was being subjected to a discriminatory discharge.

It has already been said that Humana's proffered explanation for disciplining and

then firing Farrow is her occasional "late" arrivals. In arguing that her performance was in fact up to snuff (and relatedly that Humana's stated reason was pretextual), Farrow urges that there was no reasonable basis for disciplining her because on at least seven of the nine occasions for which Farrow was disciplined[16] she was either at work (albeit in another part of the building) or was not expected to come in until later due to scheduled evening classes. And Farrow points to similarly-situated but non-black nurse Phelan who was not similarly disciplined for comparable conduct.

All of that provides a classic example of circumstantial proof of discriminatory intent (see, e.g., *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931 (7th Cir.1993)). Even if it were to be assumed that the Education Coordinator schedules were not intended by Department policy (as fashioned by Kaneski) to be as flexible as Farrow and Phelan treated them in practice (a questionable assumption at best), of course Humana could not properly enforce that policy as to Farrow while blindly ignoring similar infractions by Phelan. Selective enforcement of facially neutral regulations is, if anything, more insidious than outright discriminatory regulations because such subsurface discrimination is more difficult to detect. At a minimum, Farrow's account raises a genuine factual issue as to whether her activities were scrutinized more carefully than comparable employee Phelan.

So this last of Farrow's claims survives as well. In view of Farrow's version of the events that caused her complaints and then led up to her discipline, formal charges and final termination, a jury could reasonably conclude that Humana terminated Farrow because of her race and in retaliation for her attempts to safeguard her right to be free from discrimination.

### Conclusion

Because such a reasonable jury could conclude that Farrow was treated in a statutorily prohibited discriminatory fashion, both in relation to her racial discrimination claim and her retaliation claim, Humana's motion for summary judgment is denied in its entirety.[17] This action is set for a status hearing at 9 a.m. November 18, 1999. At that time counsel for the parties should be prepared to discuss the necessary steps in preparation for the early trial of Farrow's claims.

### Appendix

This Court normally makes no claim to prescience. Nonetheless, it was in this very case that this Court, having expressed its concern that Humana's stated intention to move for summary judgment might be ill-considered, issued its July 21, 1999 memorandum opinion and order (1999 WL 558132) that was accompanied by an Appendix that addressed in cost-benefit terms the alternatives of Rule 56 motions and preparation for trial. And that opinion specifically forewarned Humana in these terms (*id.* at *2–*3):

> [I]f it were to develop that the initial impression created by the parties' current submissions were correct, so that one or more genuine issues of material fact existed that should have been recognized by Humana's counsel (thus contraindicating the decision to pursue the summary judgment route in objective terms), this Court would have to give consideration to mulcting Humana or its counsel or both in expenses occasioned by the incremental effort that had been thrust on Farrow and her counsel in being forced to follow that Rule 56 path to a dead end.

Despite that forewarning, Humana's counsel proceeded down the Rule 56 road. If Humana's original Memorandum of Law in Support of Motion for Summary Judg-

---

16. Due to imperfect memory, Farrow was unable to either confirm or deny the timing of her arrival on two occasions.

17. See Appendix.

ment were to be read alone, it might be thought that Humana should prevail at this stage of the proceedings. But that initial Rule 56 presentation by Humana reflects a kind of self-hypnosis that no lawyer can afford to practice in the summary judgment context—a view of the evidence through the lens of the Rule 56 movant rather than, as the Rule expressly mandates, that of the nonmovant (indeed, that of the nonmovant with the aid of all reasonable favorable inferences).

Now that this Court has examined the parties' submissions and the evidence from the proper perspective—one that credits Farrow's version (with the required reasonable inferences) rather than Humana's—it has confirmed that from any objective viewpoint this case should never have been the subject of a summary judgment motion, chock-full as it is of genuine issues of material fact. This Court's own opportunity costs are of course nonrecoverable. But if it were to turn out that Farrow's counsel, having been forced to engage in this extra effort rather than proceeding to trial, were to lose at trial (when, unlike the current situation, credibility determinations will be called for), this Court would be compelled to give very serious consideration indeed to implementing the caveat quoted above pursuant to 28 U.S.C. § 1927. In that event it would be left to Humana and its counsel to determine where the burden of that sanction would fall as between themselves.